T.C. Memo. 1999-359


UNITED STATES TAX COURT


SABA PARTNERSHIP, BRUNSWICK CORPORATION,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


OTRABANDA INVESTERINGS PARTNERSHIP, BRUNSWICK CORPORATION,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 1470-97, 1471-97.          Filed October 27, 1999.


During 1990 and 1991, B, a domestic corporation, realized substantial capital gains from the sale of a number of its business units.

In 1990, B joined with a foreign bank (ABN) to form two general partnerships, S and O. Immediately upon their formation, S purchased private placement notes (PPNs) and O purchased certificates of deposit (CDs). Within 1 month, and immediately prior to the close of the partnerships' first taxable year, S and O sold their PPNs and CDs for cash (80 percent) and LIBOR notes (20 percent). These transactions were intended to satisfy the requirements of a contingent installment sale under I.R.C. sec. 453. Relying on the ratable basis recovery rules under sec. 15A.453-1(c), Temporary

Income Tax Regs., 46 Fed. Reg. 10711 (Feb. 4, 1981), the partnerships applied one-sixth of their bases in the PPNs and CDs in computing their "gains" on the sales of the PPNs and CDs.  Due to a large disparity in the partners' initial capital contributions to the partnerships, ABN was allocated 90 percent of the "gains" on the sales of the PPNs and CDs.  As a foreign entity, ABN's distributive share of the partnerships' "gains" was not subject to U.S. income tax.

Following the close of the partnerships' first taxable year, ABN's interests in the partnerships were reduced through direct purchases by B and redemptions by the partnerships.  S and O subsequently distributed cash to ABN and the LIBOR notes to B.  B sold the LIBOR notes for cash.  Relying on the ratable basis recovery rules under sec. 15A.453-1(c), Temporary Income Tax Regs., supra, B allocated the remaining bases in the PPNs and CDs in computing its "losses" on the sales of the LIBOR notes.  For the taxable years ending 1990 and 1991, B reported capital losses of $142,953,624 and $32,631,287, respectively.

Held:  The disputed transactions were not motivated by legitimate non-tax business purposes and were not imbued with objective economic substance. Held, further, the disputed transactions are shams that will not be respected for Federal income tax purposes. Held, further, the partnerships' income for the years in issue does not include interest earned on the PPNs and CDs.  Held, further, the partnerships are entitled to deductions for certain organizational expenses subject to the limitations contained in sec. 709(b), I.R.C.

Joel V. Williamson, Thomas C. Durham, Daniel A. Dumezich, Clisson S. Rexford, Gary S. Colton, Jr., Stuart E. Thiel, Neil B. Posner, and Judith P. Zelisko, for petitioner.

Jill A. Frisch, Karen P. Wright, Lewis R. Mandel, and Theresa G. McQueeney, for respondent.

CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . 7

I.   Brunswick Corporation  . . . . . . . . . . . . . . . . 7
     A.  Business Groups  . . . . . . . . . . . . . . . . . 7
     B.  Takeover Concerns/Defenses . . . . . . . . . . . . 8
     C.  Divestitures . . . . . . . . . . . . . . . . . . . 11
     D.  Merrill Lynch Partnership Proposal . . . . . . . . 14
     E.  The Zelisko Memorandum . . . . . . . . . . . . . . 14
     F.  O'Brien's Interest Rate Forecast . . . . . . . . . 20

II.  Algemene Bank Nederland N.V.  . . . . . . . . . . . . 20

III. Saba Partnership . . . . . . . . . . . . . . . . . . . 23
     A.  Sodbury Corporation  . . . . . . . . . . . . . . . 23
     B.  Skokie Investment Corporation  . . . . . . . . . . 25
     C.  Saba Organizational Meeting  . . . . . . . . . . . 25
     D.  Miscellaneous Fees . . . . . . . . . . . . . . . . 27

IV.  Saba Transactions  . . . . . . . . . . . . . . . . . . 30
     A.  Purchase of Private Placement Floating Rate Notes  . 30
     B.  Saba's Sale of Private Placement Notes . . . . . . 31
     C.  McManaman's Tax Projections  . . . . . . . . . . . 37
     D.  Brunswick's Purchase of 50 Percent of Sodbury's
         Partnership Interest . . . . . . . . . . . . . . . 38
     E.  Brunswick-ABN Consulting Agreement . . . . . . . . 39
     F.  Payments on 4 LIBOR Notes  . . . . . . . . . . . . 39
     G.  Distribution of 3 LIBOR Notes to Brunswick . . . . 39
     H.  Brunswick's Sale of 3 LIBOR Notes  . . . . . . . . 40
     I.  Partial Redemption of Sodbury's Partnership Interest
         . . . . . . . . . . . . . . . . . . . . . . . . . 43
     J.  Payments on Norinchukin LIBOR Note . . . . . . . . 43
     K.  Transfer and Termination of 3 LIBOR Notes  . . . . 44
     L.  Formation of SBC International Holdings, Inc. (SBC) 44
     M.  Downgrade of Brunswick's Credit Rating . . . . . . 45
     N.  Dissolution of Saba  . . . . . . . . . . . . . . . 45
     O.  Dissolution of Sodbury . . . . . . . . . . . . . . 47
     P.  SBC's Sale of Remaining Norinchukin LIBOR Note . . 48
     Q.  Termination of Chase Private Placement Notes . . . 49

V.   Saba-Related Swaps . . . . . . . . . . . . . . . . . . 49
     A.  Fuji and Norinchukin Swaps . . . . . . . . . . . . 49
     B.  Sodbury-ABN-Merrill Lynch Swaps  . . . . . . . . . 51
     C.  Bank of Tokyo Swaps  . . . . . . . . . . . . . . . 51

D.   Banque Francaise du Commerce Exterieur Swaps . . . .   51
E.   Brunswick Swaps . . . . . . . . . . . . . . . . . . .   52

VI.   Otrabanda Investerings Partnership . . . . . . . . . . .   53
A.   Structure . . . . . . . . . . . . . . . . . . . . . .   53
B.   Bartolo Corporation . . . . . . . . . . . . . . . . .   55
C.   Otrabanda Organizational Meeting . . . . . . . . . .   56
D.   Miscellaneous Fees . . . . . . . . . . . . . . . . .   60

VII.   Otrabanda Transactions . . . . . . . . . . . . . . . .   61
A.   Otrabanda's Purchase of Certificates of Deposit  . .   61
B.   Otrabanda's Sale of Certificates of Deposit  . . . .   62
C.   Brunswick's Purchase of 50 Percent of Bartolo's
     Partnership Interest  . . . . . . . . . . . . . . . .   67
D.   Payments on LIBOR Notes  . . . . . . . . . . . . . .   68
E.   Distribution of LIBOR Notes to Brunswick . . . . . .   68
F.   Brunswick's Sale of LIBOR Notes  . . . . . . . . . .   69
G.   Partial Redemption of Bartolo's Partnership Interest
     . . . . . . . . . . . . . . . . . . . . . . . . . . .   70
H.   Formation of OBC International Holdings, Inc.  . . .   72
I.   Dissolution of Otrabanda . . . . . . . . . . . . . .   72
J.   Dissolution of Bartolo . . . . . . . . . . . . . . .   74
K.   Termination of the 4 LIBOR Notes . . . . . . . . . .   75
L.   Termination of the IBJ CDs . . . . . . . . . . . . .   75

VIII.   Otrabanda-Related Swaps . . . . . . . . . . . . . . .   75
A.   Otrabanda Swap . . . . . . . . . . . . . . . . . . .   75
B.   Sumitomo Swaps . . . . . . . . . . . . . . . . . . .   75
C.   Bartolo-ABN-Merrill Lynch Swaps  . . . . . . . . . .   76
D.   Banque Francaise du Commerce Exterieur Swaps . . . .   76
E.   Brunswick Swaps . . . . . . . . . . . . . . . . . . .   76

IX.   Saba's and Otrabanda's Tax Returns . . . . . . . . . . .   77

X.   Brunswick's Partnership Expenses . . . . . . . . . . . .   77
A.   Transaction Costs  . . . . . . . . . . . . . . . . .   77
B.   Legal and Accounting Fees  . . . . . . . . . . . . .   78
C.   Total Expenses . . . . . . . . . . . . . . . . . . .   79

XI.   Interest Rate Forecasts . . . . . . . . . . . . . . . .   81

XII.   Brunswick's Tax Returns and Related Documents . . . . .   83

XIII.   Respondent's Determinations . . . . . . . . . . . . .   85
A.   Saba FPAA  . . . . . . . . . . . . . . . . . . . . .   85
B.   Otrabanda FPAA . . . . . . . . . . . . . . . . . . .   86

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . 87

I.   Evidentiary Matters . . . . . . . . . . . . . . . . . . 88
     A.  Attorney-Client Privilege  . . . . . . . . . . . . 89
     B.  Work-Product Doctrine  . . . . . . . . . . . . . . 91


     II.  Contingent Installment Sale Provisions  . . . . . 93

III.  Petitioner's Argument That An Economic Substance Analysis
     Is Not Warranted . . . . . . . . . . . . . . . . . . . 96
     A.  Gregory v. Helvering and Horn v. Commissioner  . . 96
     B.  Section 1001 and Cottage Savings . . . . . . . . . 103

IV.  Petitioner's Contention That CINS Transactions Are Imbued
     With Economic Substance  . . . . . . . . . . . . . . . 110
     A.  Business Purpose . . . . . . . . . . . . . . . . . 112
     B.  Economic Substance . . . . . . . . . . . . . . . . 117
     C.  Conclusion . . . . . . . . . . . . . . . . . . . . 129

V.  Secondary Issues  . . . . . . . . . . . . . . . . . . . 130

MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, Judge:  Respondent issued a notice of final partnership administrative adjustment (FPAA) to Saba Partnership (Saba) setting forth adjustments to Saba's partnership returns for the taxable years ended March 31, 1990, March 31, 1991, and June 21, 1991.  Respondent also issued an FPAA to Otrabanda Investerings Partnership (Otrabanda) setting forth adjustments to Otrabanda's partnership returns for the taxable years ended July 31, 1990, and June 21, 1991.  Brunswick Corporation, the tax matters partner for both Saba and Otrabanda, invoked the Court's jurisdiction by filing timely petitions for readjustment challenging the FPAAs.  (For simplicity, we refer to Brunswick

Corporation as Brunswick or petitioner.) These cases were consolidated for purposes of trial, briefing, and opinion.

On the date that Brunswick filed the petitions herein, Saba and Otrabanda had been liquidated and no longer maintained a principal place of business.

Respondent's adjustments in these cases are based on alternative determinations. The central issue for decision is whether the partnerships' purported contingent installment sale transactions (hereinafter CINS transactions) should be disregarded for tax purposes because they lack economic substance.

Unless otherwise clear from the context, the following words, their derivatives, and related terms are used for narrative convenience only to describe the form of the disputed transactions: "invest", "purchase", "gain", "loss", "borrow", "loan", "pay", "sale", "distribute", "note", "agreement", "commission", and "interest". By our use of such terms, we do not mean to suggest any conclusions concerning the actual substance or characterization of the transactions for tax purposes. Unless otherwise indicated, section references are to sections of the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and exhibits are incorporated herein by this reference.

I.   Brunswick Corporation

A.   Business Groups

Brunswick, headquartered in Skokie, Illinois, has been in business for over 150 years.  Brunswick's stock is traded on the New York, Midwest, Pacific, London, and Tokyo stock exchanges.

During the late 1980s, Brunswick's operations were organized among 3 lines of business:  Marine, Recreation, and Technical.  The Marine group manufactured and sold pleasure and fishing boats and marine engines on a worldwide basis.  The Recreation group operated 125 recreation centers worldwide and manufactured and sold fishing rods, reels, and accessories, and golf, bowling, and billiards products.  The Technical group, which consisted of the Defense, Technetics, and Industrial Products divisions, manufactured and sold a wide variety of products for military, aerospace, and industrial use.

Jack F. Reichert (Reichert) served as Brunswick's chairman, president, and chief executive officer; William R. McManaman (McManaman) served as Brunswick's vice president-Finance; Thomas K. Erwin (Erwin) served as Brunswick's controller; Richard S.

1.  O'Brien (O'Brien) served as Brunswick's treasurer; and Judith P. Zelisko (Zelisko), an attorney, served as Brunswick's assistant vice president, Director of Taxes.

In June 1988, Reichert informed Brunswick's Board of Directors that the company's sales of marine products, then approximately 75 percent of Brunswick's overall net sales, appeared to be slowing.  In fact, between 1988 and 1989, Brunswick's net marine sales dropped from $2,449,000,000 to $2,000,000,000, or by approximately 18 percent.  In response to these developments, Brunswick immediately reduced capital expenditures in marine-related manufacturing facilities and equipment, permanently closed two boat manufacturing plants, idled 5 other plants, and laid off 5,000 employees.

On October 24, 1989, Standard and Poor's Corporation (Standard & Poor's) downgraded Brunswick's long-term debt rating from A- to BBB+.  Standard and Poor's did not change Brunswick's commercial paper rating.  During this period, Reichert and McManaman determined that it would be in Brunswick's best interests to maximize the company's cash-flow and reduce debt.

B.  Takeover Concerns/Defenses

In 1981, Brunswick's stock was selling at a discount to book value.  In January 1982, Whittaker Corporation (Whittaker) made an unsolicited tender offer in an effort to acquire 49 percent of the total voting power of Brunswick's outstanding securities.  It

appears that Whittaker coveted Sherwood Medical Industries, Inc. (Sherwood), a Brunswick subsidiary, and that Whittaker intended to sell Brunswick's remaining businesses if its takeover attempt were successful. Brunswick determined that the Whittaker tender offer was unfair to Brunswick's shareholders and successfully defeated the takeover attempt by selling Sherwood to American Home Products, Inc.

During the period 1982 to 1983, Gulf & Western Industries, Inc. (Gulf & Western), accumulated up to 21 percent of Brunswick's stock and threatened a takeover. The Gulf & Western takeover threat abated when Gulf & Western's chief executive officer died unexpectedly in February 1983.

During the 1980s, Brunswick took the following steps to deter a hostile takeover: (1) Revised several of its compensation-related programs in order to protect the interests of its employees; (2) amended its charter to (a) provide for staggered elections of directors, (b) restrict actions by stockholders outside of stockholder meetings, and (c) increase the number of authorized shares of Brunswick common stock from 40 million to 100 million shares; (3) amended the company's salaried pension plans to protect against the use of Brunswick's excess pension funds to finance a hostile takeover of the company; (4) adopted a Preferred Share Purchase Rights Plan or poison pill; and (5) amended its deferred compensation arrangements to provide

that all amounts held under such arrangements could be paid to the participants in the event of a change in control of the company.

During March 1989, rumors surfaced that Irwin Jacobs or Ron Perlman might attempt to take over Brunswick. On March 30, 1989, Dow Jones News Service reported that McManaman had dismissed the rumors. Nevertheless, on March 31, 1989, Brunswick's Board of Directors called a special meeting and decided to amend the company's "poison pill" to provide, among other things, that if a person or group were to acquire 15 percent or more of Brunswick's common stock, other stockholders would be permitted to purchase Brunswick common stock at a discount of 50 percent of market price. On April 1, 1989, the New York Times reported that Mr. Jacobs had denied that he was planning a takeover bid for Brunswick. In April 1989, Brunswick amended its Employee Stock Option Plan (ESOP) to permit the plan to borrow funds in order to purchase Brunswick stock. Shortly after the amendment was adopted, the ESOP obtained a bridge loan of $100 million, guaranteed by Brunswick, and purchased 5,095,542 shares of Brunswick common stock.

No formal hostile takeover attempt was initiated against Brunswick during 1989 or 1990.

C.  <u>Divestitures</u>

In 1988, Brunswick decided to sell a number of businesses in its Technical group.  In June 1989, Brunswick announced its intention to sell its Industrial Products Division (IPD), including Vapor Corporation and a group of businesses known as TXT.  In October 1989, Brunswick announced its intention to sell its Technetics Division, including Energy Conservation Systems, Circle Seal, and MIMS.

On June 24, 1989, Brunswick executed a letter agreement with Merrill Lynch Capital Markets, a subsidiary of Merrill Lynch & Co., Inc. (hereinafter collectively referred to as Merrill Lynch), under which Merrill Lynch agreed to act as Brunswick's exclusive financial adviser in connection with the sale of IPD (the IPD fee agreement).  Brunswick agreed to pay Merrill Lynch a fee for its services as follows:

> (i) in the case of a single sale transaction, 1.25% of the aggregate purchase price paid in such sale transaction, (but in no event less than $1,000,000) or (ii) in the case of multiple sale transactions, the sum of (1) 1.25% of the aggregate purchase price paid for Vapor and (2) 2.50% of the aggregate purchase price paid for any or all of the businesses which comprise TXT, each such transaction fee payable in cash upon the closing of each such sale transaction.

As of January 1989, Brunswick owned 3.1 million shares, or approximately 36 percent, of Nireco Corporation (Nireco), a Japanese corporation.  In October 1989, Brunswick sold 400,000 of its Nireco shares in connection with a public offering and

listing of Nireco shares on the Japanese Over-the-Counter stock exchange. In November 1989, Brunswick decided to sell all of its remaining Nireco shares.

On January 29, 1990, Brunswick and Merrill Lynch executed a letter agreement under which Merrill Lynch agreed to act as Brunswick's exclusive financial adviser in connection with the sale of Brunswick's Nireco stock in exchange for a fee of 1.125 percent of the proceeds of the sale (the Nireco fee agreement).

On March 5, 1990, Reichert and McManaman appeared before the New York Society of Security Analysts. McManaman informed the analysts that Brunswick anticipated realizing approximately $125 million from the sale of businesses in its Technical group and that net proceeds from the sales would be used to reduce Brunswick's debt. Between October 1989 and October 1990, Brunswick's debt to capitalization ratio was reduced from 42.2 percent to 28.3 percent.

On March 28, 1990, Brunswick and Merrill Lynch executed a letter agreement amending the IPD and Nireco fee agreements to provide that Brunswick would pay additional fees of $750,000, $500,000, and $250,000 upon the sales of Vapor Corporation, TXT, and Brunswick's Nireco stock, respectively.

On September 4, 1990, Brunswick and Merrill Lynch executed a letter agreement further amending the IPD and Nireco fee agreements to provide that Brunswick would pay additional fees of

$500,000 and $675,000 upon the sales of Vapor Corporation and Brunswick's Nireco stock, respectively.

Brunswick sold the following businesses from its Technical group on the dates and at the prices indicated:

| Transaction | Date | Sales Price |
| --- | --- | --- |
| Nireco - 400,000 shares | October, 1989 | $16,606,964 |
| Energy Conservation Systems | May 11, 1990 | 37,220,000 |
| Vapor AC | June 27, 1990 | 4,515,000 |
| Nireco - 2,386,000 shares | July 1990 | 91,061,851 |
| TXT (Valve & Control) | August 24, 1990 | 22,532,000 |
| Circle Seal | September 6, 1990 | 24,500,000 |
| MIMS | September 6, 1990 | 845,000 |
| Nireco - 450,000 shares | September, 1990 | 13,433,275 |
| Vapor | December 21, 1990 | 39,502,000 |

The $22,532,000 sales price for TXT included a $7,500,000 promissory note. On December 28, 1990, Brunswick received $5,500,000 in exchange for cancellation of the note.

On October 22, 1990, Brunswick paid Merrill Lynch $1,210,493--an amount equal to 1.125 percent of the proceeds from the sale of 2,836,000 Nireco shares, plus an additional $925,000 pursuant to the March 28 and September 4, 1990, amendments to the Nireco fee agreement.

On January 18, 1991, Brunswick paid Merrill Lynch $1,161,116--an amount equal to 1.25 percent of the proceeds from the sale of Vapor Corporation and Vapor AC, and 2.5 percent of the sales price of TXT, plus an additional $1,750,000 pursuant to the March 28 and September 4, 1990, amendments to the IPD fee agreement.

Brunswick filed a Form 1120 (U.S. Corporation Income Tax Return) for 1990 reporting capital gains of $29,809,938 and $100,782,182 attributable to the sales of its Technetics division businesses and Nireco stock, respectively.

D.  Merrill Lynch Partnership Proposal

In December 1989, after Brunswick had announced its intention to sell its Technical businesses and Nireco stock, Brunswick officials, including McManaman, Erwin, and Zelisko, met with representatives of Merrill Lynch's investment banking group, including E.S.P. Das (Das), managing director and vice chairman of Investment Banking, Arshad R. Zakaria (Zakaria), Thomas R. Williams, Jr. (Williams), and Jeff Neal (Neal).  During this meeting, Das described a structured transaction, including the formation of a partnership between Brunswick and a foreign financial institution, that would generate capital losses that Brunswick could use to offset the capital gains that it would realize from the sale of its Technical businesses.

Merrill Lynch used flowcharts in making its presentation to Brunswick.  The only scenario depicted in the flowcharts was a tax loss for Brunswick.

E.  The Zelisko Memorandum

In January 1990, O'Brien and Zelisko attended a second meeting with Das and other Merrill Lynch representatives for further discussions regarding the partnership proposal.  On

January 26, 1990, Zelisko prepared a memorandum, addressed to

Erwin and McManaman, summarizing the Merrill Lynch partnership

proposal in pertinent part as follows:

> Set forth below is a bullet point summary of a
> transaction proposed by Merrill Lynch to Brunswick
> Corporation (BC) on December 8, 1989 to generate
> sufficient capital losses to offset the capital gain
> which will be generated on the sale of the Nireco
> shares.  The specific dollar amounts can be adjusted to
> increase or decrease the capital loss required.
>
> Step 1:
>
> BC and an unrelated foreign partner (FP) would form a
> Partnership no later than March 1, 1990 with BC
> contributing $20 million in cash and the FP
> contributing $180 million in cash.  The Partnership
> would have a fiscal year-end of March 31st since that
> would be the year-end of the FP, the majority Partner.
>
> Step 2:
>
> Partnership buys a private placement note for $200
> million with the cash in the Partnership and holds the
> note for one month.
>
> Step 3:
>
> Before March 31, 1990, the Partnership would sell the
> $200 million private placement note for $160 million in
> cash and five-year contingent note with an assumed fair
> market value (fmv) of $40 million.  Under this
> contingent note, payments would be made to the
> Partnership over a five-year period equal to LIBOR[1]
> times a fixed notional principal.  The details
> concerning the terms of this note require further
> discussion by the Treasury Department with Merrill
> Lynch.

---

[1]  LIBOR is an acronym for London Interbank Offering Rate
which is the primary fixed income index reference rate used in
European financial markets.

The Partnership would recognize gain on the sale of the private placement note calculated as follows:

| | |
|---|---|
| Cash | 160.0 |
| Basis | 33.3 |
| (1/6 of 200) | _____ |
| Gain | 126.7 |
| | |
| BC's Gain | 12.67 |
| FP's Gain | 114.03 |
| Total Gain | 126.70 |

BC's share of the gain equals its 10% ownership in the Partnership for a taxable gain to BC of $12.67 million in 1990.

Step 4:

In April 1990 or later, (i.e. until there has been some movement in the value of the contingent note) BC buys 50% of FP's interest in the Partnership for $90 million, assuming that the fmv of the contingent note is still $40 million.  With this purchase, BC's basis in its Partnership interest is $122.67 million calculated as follows:

| | |
|---|---|
| BC's initial investment | $20.0 million |
| Gain | 12.67 |
| Purchase of 50% of FP's interest | 90.00 |
| | 122.67 |

Step 5:

The Partnership distributes the contingent note to BC assuming a fmv of $40 million.  In addition, the Partnership would distribute approximately $32.72 million in cash to FP which is the equivalent cash distribution to FP given its percentage ownership.

Step 6:

BC sells the contingent note for cash.  This sale of the contingent note by BC generates the capital loss.

```
        BC's basis in the note        122.67
        FMV of the note                40.00
        Capital loss                   82.67
        Net Gain on sale of FP note    12.67
        Net Capital loss               70.00
```

After the sale of the note, BC's tax basis in the Partnership is zero and the Partnership still has 127.28 in cash (160-32.72).

Step 7:

In April 1991, the Partnership will be terminated. There cannot have been any agreements, negotiations, or understandings of any kind among the Partners or their representatives regarding the possible liquidation of the Partnership or the assets to be distributed to each respective Partner upon termination and liquidation of the Partnership or the transactions described in Steps 4 and 5. Prior to termination, 55% of the cash in the Partnership will be contributed to Newco, a wholly-owned subsidiary of the Partnership. Upon termination of the Partnership, the Newco stock will be distributed to BC and the remaining cash to FP.

Risks Involved

[Redacted material deleted.] Merrill Lynch did assure us that their fee would not be due if the tax law changed prior to implementation.

Cost Involved:

1. Merrill Lynch's fee is 5-10% of the tax savings. Assuming a capital loss of $82 million, the tax savings would be around $28 million and a 10% fee on such savings results in a fee of $2.8 million. This 10% fee is negotiable. Also, need to clarify whether the fee is on the gross or net capital loss generated.

2. Legal fees for BC and operating expenses of the Partnership which would be paid by BC, would run about $400,000 - $500,000.

3. Compensation fees to the FP. Merrill Lynch talked in terms of 40-75 basis points on the FP's equity investment.

4.  Bid/offer spread on the private placement note and on the contingent note.

The foregoing should be viewed as a summary of the Merrill Lynch proposal.  [Redacted material deleted.]

Merrill Lynch's partnership proposal, and specifically the partnership's purchase of private placement notes (PPNs) and their subsequent sale for approximately 80 percent cash and 20 percent LIBOR notes, was intended to comply with the contingent installment sale provisions and ratable basis recovery rules under section 453 and section 15A.453-1(c), Temporary Income Tax Regs., 46 Fed. Reg. 10709 (Feb. 4, 1981).

Merrill Lynch's role was to manage all aspects of the transactions, including enlisting the foreign partner, serving as a financial adviser to the partnership, arranging for the purchase and sale of the PPNs, and arranging for the purchase and sale of the LIBOR notes.

On February 7, 1990, O'Brien wrote a memorandum to McManaman regarding investment of the proceeds that Brunswick would derive from the sale of its Technical businesses.  O'Brien suggested that Brunswick's need for investment advice should be used as a "vehicle to acquaint ourselves with the investment expertise of a sophisticated financial institution with worldwide marketplace experience."

On February 13, 1990, McManaman, O'Brien, and Zelisko appeared before Brunswick's Board of Directors.  The minutes of the meeting state in pertinent part:

> Mr. McManaman described a proposal for a partnership with a foreign entity.  The arrangement would require the Company to make an equity investment in the partnership of at least $20 million and not more than $120 million in cash which would be invested in a diversified portfolio of investments, including high quality debt instruments, by the partnership.  Mr. McManaman then discussed the business purpose, tax benefits and risks in the arrangement.

The minutes do not describe the business purpose underlying Brunswick's participation in the partnership.  McManaman recommended approval of the proposal with the caveat that Brunswick would not proceed with the transaction if management were dissatisfied with the proposed foreign partner.   McManaman believed that tax benefits were a primary reason for Brunswick to invest in the partnership.

The Board of Directors immediately authorized both McManaman and O'Brien, or either of them, to enter into a partnership on behalf of Brunswick for an equity investment of at least $20 million and not more than $120 million.  On April 3, 1990, Brunswick's Board of Directors conducted a meeting by way of a telephone conference call and, upon the recommendation of McManaman, authorized McManaman or O'Brien, or either of them, to enter into a second partnership on behalf of Brunswick for an equity investment of at least $20 million and not more than $120

million.  The second partnership investment was recommended because Brunswick was generating additional cash and capital gains from the sale of its Technical businesses and Nireco stock. The Board of Directors also authorized McManaman and/or O'Brien to enter into agreements on behalf of Brunswick for the purchase and sale of treasury securities for forward delivery and to increase the amount authorized for interest rate swap transactions up to $225 million.

F.  O'Brien's Interest Rate Forecast

One of O'Brien's duties as Brunswick's treasurer was to track the movement of interest rates.  In early 1990, O'Brien believed that interest rates would rise.  However, during the period June through September 1990, O'Brien's view of the direction of interest rates was "in transition", and he was uncertain whether interest rates would rise or fall.  By early September 1990, O'Brien was convinced that interest rates would fall.

II.  Algemene Bank Nederlands N.V.

During the period in question, Algemene Bank Nederlands N.V. (ABN), was the largest bank in the Netherlands.  During all relevant periods, ABN offered comprehensive corporate, institutional, and individual financial services including domestic and international lending, trade finance and international payments, international corporate finance and

advisory services, global investment management and advisory
services, foreign exchange, treasury, and risk management
services, and trust services.  ABN Trust Company (ABN Trust), was
an ABN affiliate.

In 1989, Merrill Lynch representatives contacted Johannes
den Baas (den Baas), vice president, Corporate Finance (ABN-New
York), and proposed that ABN enter into general partnerships with
certain U.S. corporations.  In an August 7, 1989 memorandum to
Arthur Arnold, executive vice president, Corporate Finance (ABN-
New York), den Baas described the structure of the partnerships
and timing of partnership investments in terms substantially
similar to those set forth in the Zelisko memorandum.  Unlike the
Zelisko memorandum, den Baas stated that the partnership was
designed to reduce a U.S. corporation's liability for alternative
minimum tax.  The den Baas memorandum includes a discussion of
the financial risks to ABN in pertinent part as follows:

> Credit risk:  The structure demands that virtually no
> credit risk will be taken in the partnership since any
> defaults on the principal of the investments will
> jeopardize the objective as described hereafter.  The
> nature of paper invested in will be of the highest
> credit quality and will have short term maturities.
> * * *
>
>     *    *    *    *    *    *    *
>
> Market interest rate risk:  ABN New York will take care
> of perfect hedges in order to protect the bank from the
> changes in the value of the underlying securities * * *
> due to interest rate fluctuations.  * * *

> Legal and tax risk for ABN will be covered by opinions
> of legal and tax counsel.  Furthermore the proposed
> structure for ABN that follows will in itself provide a
> protection against U.S. tax liabilities.

den Baas summarized ABN's remuneration for participating in the

partnerships as follows:

> The remuneration for ABN * * * will be 70-80 bps.
> spread over the outstanding participation plus $100,000
> upfront fee and all out of pocket expenses covered
> (legal fees etc.).  Since the structure itself will not
> carry the possibilities for this level of remuneration
> the income will be received by ABN New York in upfront
> payments made by the corporation.

> ABN eventually formed partnerships with several U.S.

corporations.

In early 1990, Merrill Lynch representatives contacted den

Baas and inquired whether ABN would enter into a partnership with

Brunswick.  On February 15, 1990, den Baas drafted a memorandum

proposing a $180 million facility or loan to a Netherland

Antilles special purpose corporation (SPC) that would be managed

by ABN Trust and would enter into a partnership with Brunswick.

The memorandum stated in pertinent part:

> ABN will receive again an upfront fee representing 75
> bps over LIBOR over the outstanding plus the 15 bps
> funding difference between LIBOR and CP [commercial
> paper] upfront.  The amount will be around $600,000 but
> we have negotiated a minimum fee of $750,000 upfront
> excluding ABN Trust Curacao's fees.

On the same date, den Baas drafted a credit proposal which

included a description of the partnership's anticipated

investment activities, including the purchase in the last week of

February of highly rated PPNs, the sale of the PPNs in late March for cash and installment notes, investment of the cash proceeds in highly rated commercial paper, and Brunswick's gradual buy-down of ABN's partnership interest. den Baas' credit proposal stated that ABN would have the option to withdraw fully from the partnership after January 1, 1991.

On February 20, 1990, ABN's North Atlantic Credit Committee recommended approval of den Baas' credit proposal stating:

> WE RECOMMEND APPROVAL. AS BRUNSWICK DOES NOT POSSESS THE SAME HIGH CREDIT STANDING AS PREVIOUS DEALS, PLEASE MAKE SURE WE CAN LIQUIDATE THE PORTFOLIO IF BRUNSWICK IS UNABLE TO COME UP WITH THE CASH TO PAY US OUT BY JANUARY 1991.

On February 23, 1990, ABN's Risk Management Department granted approval for ABN to participate in the proposed partnership on the condition that ABN would maintain the right to liquidate the portfolio.

III. Saba Partnership

A. Sodbury Corporation

In The Netherlands, a foundation or stichting is a legal entity that is managed and administered by a board. On January 18, 1990, ABN established two stichtings, Ronde Klip Foundation (Ronde Klip) and Pietermaai Foundation (Pietermaai).

On January 18, 1990, Sodbury Corporation (Sodbury) was incorporated in Curacao, Netherlands Antilles. On February 23, 1990, Sodbury and ABN Trust executed an agreement under which ABN

Trust agreed to provide managerial services to Sodbury in exchange for an annual fee of $25,000. At the time that Sodbury was incorporated, Ronde Klip and Pietermaai each received one-half or 3,000 shares of the 6,000 shares of Sodbury common stock authorized to be issued. Each Sodbury share had a par value of $1 for a total capitalization of $6,000.

On February 26, 1990, ABN's Willemstad branch (ABN-Willemstad) and Sodbury entered into a revolving credit agreement (RCA) under which ABN-Willemstad agreed to loan Sodbury up to $125 million. By agreements dated February 26, 1990, Ronde Klip and Pietermaai pledged their Sodbury stock as security for the RCA.

On February 26, 1990, ABN-Willemstad and Sodbury entered into a second agreement under which ABN-Willemstad agreed to lend Sodbury up to $60 million, subordinated to the RCA described above. Sodbury would not be required to pay interest on any such loan unless the outstanding principal was not paid on the expiration date.

By agreements dated February 26, 1990, Ronde Klip and Pietermaai granted ABN irrevocable options to purchase their Sodbury shares at par value.

Sodbury was organized to participate as a general partner in Saba because ABN was not interested in assuming the unlimited liability of a general partner and ABN's loans to Sodbury could be syndicated.

B.  Skokie Investment Corporation

On February 21, 1990, Brunswick organized a wholly owned subsidiary, Skokie Investment Corporation (Skokie), under the laws of the State of Delaware.  On February 28, 1990, Brunswick agreed to lend Skokie $1 million in exchange for a demand promissory note in that amount with interest at the prime rate.

C.  Saba Organizational Meeting

On February 22, 1990, Brunswick representatives McManaman, O'Brien, and Zelisko met in Bermuda with ABN representatives den Baas and Peter H. de Beer (de Beer), Assistant Managing Director, and Merrill Lynch representatives Macauley R. Taylor (Taylor), Managing Director for Merrill Lynch Capital Markets, Das, and Zakaria.  Lawyers from the law firms of Cravath, Swaine & Moore, and Mayer, Brown, & Platt, also attended the Bermuda meeting. This was the first meeting between Brunswick and ABN.  During this meeting, McManaman and ABN representatives discussed the possibility of ABN's providing consulting services to Brunswick for a fee.

On February 22, 1990, Brunswick and Merrill Lynch executed a letter agreement under which Merrill Lynch agreed to serve as

Brunswick's financial adviser regarding Saba in exchange for a fee of $500,000. Brunswick paid Merrill Lynch's fee on April 4, 1990.

By partnership agreement dated February 23, 1990, Brunswick, Skokie, and Sodbury formed Saba as a general partnership under the laws of the State of New York. The partners agreed that Saba would maintain its principal place of business in Curacao, Netherlands Antilles. The partnership agreement stated that the partnership was being formed "for the object and purpose of making investments in notes, bonds, debentures, and other interest bearing instruments, owning, managing and supervising such investments, sharing the profits and losses therefrom, and engaging in such activities necessarily incidental or ancillary thereto." The partnership agreement further stated that generally each item of partnership income, gain, expense, and loss for each fiscal year would be allocated among the partners in proportion to each partner's capital account. However, if a partner's proportionate interest in partnership capital were to change during any fiscal year, the partnership's books would be closed as of the date of such a change and partnership income, gain, expense, and loss would be allocated to the partners in proportion to their respective capital accounts as determined immediately prior to such change. The partnership agreement stated that a partner would be permitted to request in writing

that the partnership redeem all or any portion of its partnership interest provided that no such request may be made by a partner before April 1, 1991, if such redemption would reduce the partner's partnership interest to less than $10 million. However, the partnership agreement stated that no such redemption would be permitted if Merrill Lynch determined that the redemption would cause a disorderly liquidation of the partnership's assets.

On February 28, 1990, the Saba partners made capital contributions as follows:

|  | Capital Contribution | Percentage Interest |
|---|---|---|
| Skokie | $1,000,000 | .5 |
| Brunswick | 19,000,000 | 9.5 |
| Sodbury | 180,000,000 | 90.0 |
|  | $200,000,000 | 100.0 |

Skokie made its capital contribution from the proceeds of its loan from Brunswick. Sodbury made its capital contribution from the proceeds of its loans from ABN-Willemstad. The partners' capital contributions were deposited into Saba's bank account at ABN-New York.

D. Miscellaneous Fees

On February 23, 1990, Saba executed a letter agreement with N.V. Fides (Fides), an ABN affiliate, under which Fides agreed to provide a variety of administrative services for Saba in exchange for an annual fee of $25,000. On the same date, Saba and Fides

executed a second letter agreement in which Saba agreed to indemnify Fides. During 1990 and 1991, Saba made the following payments to N.V. Fides:

| Date | Amount |
| --- | --- |
| May 21, 1990 | $53,921.81 |
| August 22, 1990 | 1,156.50 |
| September 20, 1990 | 972.16 |
| January 3, 1991 | 1,035.10 |
| March 15, 1991 | 1,093.31 |
| April 17, 1991 | 1,191.57 |
| June 21, 1991 | 1,074.35 |

On February 23, 1990, Saba (through Fides) and Merrill Lynch executed a letter agreement under which Merrill Lynch agreed to act as Saba's exclusive financial adviser. The letter agreement does not state the amount of Merrill Lynch's fee for such services. Merrill Lynch expected to be compensated for its services (at least in part) by acting as the dealer in transactions with Saba.

Saba maintained certain audited and unaudited financial statements. The audited financial statements were prepared by Arthur Andersen, Willemstad, Curacao (Arthur Andersen). The unaudited financial statements were prepared by Fides pursuant to its agreement with Saba.

Saba made the following payments to Cravath, Swaine & Moore and Arthur Andersen for professional fees:

| Date | Amount | Payee |
|------|--------|-------|
| July 31, 1990 | $130,266 | Cravath |
| November 16, 1990 | 10,000 | Arthur Andersen |
| June 21, 1991 | 10,000 | Arthur Andersen |
| June 21, 1991 | 8,851 | Cravath |
| | $159,117 | |

The $130,266 fee paid to Cravath on July 31, 1990, was composed of $125,000 for professional services and advice, $2,962.35 for miscellaneous costs, i.e., postage, copying, and messenger charges, and $2,303.65 for travel and transportation charges. In a December 2, 1994 memorandum from Cravath to Brunswick, Cravath itemized the $125,000 charge for professional services as follows:

> The $125,000.00 fee was for negotiation and drafting of the documentation, and for other related services, in connection with: (a) the formation of Saba ($19,452.45), (b) the purchase by Saba of certain notes ($25,576.37), (c) the sale by Saba of such notes ($46,649.86), (d) the assignment of Saba's right to receive payments from such sale ($11,887.60) and (e) other related matters ($21,433.72).  * * *

Saba paid commercial paper fees as follows:

| Date | Amount |
|------|--------|
| August 10, 1990 | $3,342.50 |
| September 12, 1990 | 620.00 |
| October 3, 1990 | 510.00 |
| November 6, 1990 | 840.00 |
| December 18, 1990 | 620.00 |
| January 9, 1991 | 195.00 |
| February 14, 1991 | 450.00 |
| March 15, 1991 | 415.00 |
| April 17, 1991 | 345.00 |
| May 31, 1991 | 305.00 |
| June 12, 1991 | 115.00 |
| | $7,757.50 |

IV.  Saba Transactions

A.  Purchase of Private Placement Floating Rate Notes

Merrill Lynch prearranged for Chase Manhattan Bank (Chase) to sell private placement floating rate notes (Chase PPNs) to Saba.  On February 26, 1990, Merrill Lynch transmitted to Chase a Summary of Terms for the PPNs.  On February 28, 1990, the same day that the Saba partners made their capital contributions to the partnership, Saba paid Chase $200 million for one newly-issued 5-year PPN in the principal amount of $200 million.  On March 19, 1990, Chase reissued the $200 million PPN as four $50 million 5-year PPNs.  Other than the principal amounts, the 4 PPNs had the exact same terms as the original $200,000,000 PPN.  In particular, the Chase PPNs were due on February 15, 1995, and paid interest at the 1-month commercial paper rate plus nine basis points (360-day year) converted to a money market yield for the actual number of days in the coupon period.  The rate on the PPNs was favorable to Chase because it was slightly less than Chase's alternative sources of funding.  Interest on the Chase PPNs was due and payable monthly on the third Wednesday of each month commencing on March 21, 1990.  The Chase PPNs included a European-style put option exercisable by the holder on April 17, 1991, at par plus accrued interest.

At the time the Chase PPNs were issued, Chase was rated A- by Standard & Poor's and Baa2 by Moody's Investors Service (Moody's). The Chase PPNs were not registered under the Securities Act of 1933 and were not traded on an established securities market.

On March 21, 1990, Chase made a timely interest payment of $975,298.51 to Saba on the Chase PPNs. Saba included this payment in its interest income on its Form 1065 (U.S. Partnership Return of Income) for the taxable year ended March 31, 1990.

B. Saba's Sale of Private Placement Notes

While arranging Saba's purchase of the Chase PPNs, Merrill Lynch began making arrangements for Saba to sell the Chase PPNs. On March 6, 1990, and March 8, 1990, Merrill Lynch transmitted a Summary of Terms for the Chase PPNs to Fuji Capital Markets (Fuji) and Norinchukin Bank (Norinchukin), respectively. Fuji and Norinchukin each prepared memoranda, seeking approval to purchase the Chase PPNs, which stated that the transactions were designed to provide tax savings for Merrill Lynch's customers.

Merrill Lynch had approached Fuji and Norinchukin regarding the sale of the Chase PPNs because they were able to issue debt instruments; i.e., LIBOR notes. Although Saba would have incurred lower transaction costs by selling the Chase PPNs to a money market fund, such funds were eliminated from consideration inasmuch as they could not issue LIBOR notes.

On March 13, 1990, Saba conducted a partnership meeting at Merrill Lynch's office in Toronto. O'Brien represented Brunswick and Skokie at the meeting, while de Beer represented ABN by way of a telephone conference call. Taylor and Joel Van Dusen, an Investment Banking analyst, participated in the meeting on behalf of Merrill Lynch.

During the meeting, the partners discussed their belief that interest rates were likely to rise due to a stronger economy, rising rates in Japan and Europe, and the reunification of Germany. According to minutes of this meeting, Saba adopted a resolution (at the suggestion of Merrill Lynch) authorizing and directing the sale of the Chase PPNs for consideration consisting of 80 percent cash and 20 percent contingent payments based on LIBOR. The LIBOR notes would provide for periodic payments at a designated LIBOR rate on a notional principal amount (NPA) for a set term. The LIBOR note NPA was not intended to represent the principal amount due but was used solely as a multiplier to determine the amount of LIBOR-based contingent payments.

On March 23, 1990, immediately prior to close of Saba's first taxable year, Saba sold 2 Chase PPNs to Fuji and 2 Chase PPNs to Norinchukin. In exchange for the 2 Chase PPNs sold to Fuji, Saba received $80 million in cash and 2 installment purchase agreements dated March 23, 1990 (Fuji LIBOR notes), each with a stated NPA of $25,720,000 for a total NPA of $51,440,000.

In exchange for the 2 Chase PPNs sold to Norinchukin, Saba received $80 million in cash and 2 installment purchase agreements dated March 23, 1990 (Norinchukin LIBOR notes), each with a stated NPA of $25,765,000 for a total NPA of $51,530,000.

At the time of these transactions, Fuji was rated Aa1 by Moody's and AA by Standard & Poor's, while Norinchukin was rated Aaa by Moody's and AAA by Standard & Poor's.

The sale of the Chase PPNs to Fuji and Norinchukin included $94,384 of interest that had accrued on the PPNs for the period from March 21, 1990 through March 23, 1990. Saba reported this amount as interest income on its Form 1065 for the taxable year ended March 31, 1990.

The Fuji and Norinchukin LIBOR notes were effective as of April 2, 1990, and provided for a stream of 20 quarterly payments, beginning on July 2, 1990, and ending on April 2, 1995, in an amount that would float based on 3-month LIBOR determined at the beginning of the payment period multiplied by (1) the NPA of the note, and (2) a fraction consisting of the number of days between payment dates divided by 360.

Saba sold the Chase PPNs at 99.25 percent of par, or at a private placement discount of $1,500,000 (75 basis points times $200,000,000). Paul A. Pepe (Pepe), vice president for Merrill Lynch Capital Markets, determined the origination value for the Fuji and Norinchukin LIBOR notes based upon the sum of the par

- 34 -

value of the Chase PPNs and the accrued interest on the PPNs,
less the private placement discount and the cash received upon
the sale of the Chase PPNs, as follows:

Fuji LIBOR Notes

| | |
|---|---|
| Par value of 2 Chase PPNs | $100,000,000 |
| Plus accrued interest (through March 23) | 47,192 |
| | 100,047,192 |
| Less private placement discount | (750,000) |
| | 99,297,192 |
| Less cash received | (80,000,000) |
| Merrill Lynch origination value | $ 19,297,192 |

Norinchukin LIBOR Notes

| | |
|---|---|
| Par value of 2 Chase PPNs | $100,000,000 |
| Plus accrued interest (through March 23) | 47,192 |
| | 100,047,192 |
| Less private placement discount | (750,000) |
| | $ 99,297,192 |
| Less cash received | (80,000,000) |
| Merrill Lynch origination value | $ 19,297,192 |

According to Pepe's computations, Saba received
consideration totaling $198,594,384 consisting of the
$160,000,000 in cash and the Fuji and Norinchukin LIBOR notes
with a combined present value of $38,594,384.  The difference
between the par value of the Chase PPNs plus accrued interest
($200,094,384) and the total consideration that Saba received
($198,594,384) reflects the $1,500,000 private placement discount
on the sale of the Chase PPNs.

Contrary to the origination value that Pepe assigned to the
LIBOR notes, Saba listed the value of the LIBOR notes in its

general ledger for the period ended March 31, 1990, at $40,094,384. Saba carried the LIBOR notes on its audited and unaudited financial statements at cost; i.e., the present value of the LIBOR notes of $38,594,384, plus the $1,500,000 private placement discount on the sale of the Chase PPNs. Saba adopted this approach based upon advice from Merrill Lynch. As discussed in detail below, the private placement discount on the sale of the Chase PPNs eventually was borne solely by Brunswick following the distribution and sale of the LIBOR notes.

A portion of the $1,500,000 private placement discount on the sale of the Chase PPNs was attributable to the PPNs' lack of liquidity. If Saba had invested directly in LIBOR notes, as opposed to first purchasing and then selling the Chase PPNs, Saba could have avoided the portion of the $1,500,000 discount attributable to the PPNs' lack of liquidity.

O'Brien understood that Saba had invested in the Chase PPNs, prior to its investment in the LIBOR notes, to ensure that the transactions would be treated for tax purposes as CINS transactions. The Chase PPNs were not readily tradeable on an established market. In addition, because the LIBOR notes provided for 20 variable quarterly payments, Saba could not determine the aggregate selling price of the Chase PPNs by the end of its March 31, 1990, taxable year. Consequently, Saba reported the sale of the Chase PPNs as an "installment sale"

under section 453(b). Saba computed its gain on the sale through a ratable allocation (or recovery) of its basis in the Chase PPNs under section 15A.453-1(c), Temporary Income Tax Regs., 46 Fed. Reg. 10711 (Feb. 4, 1981).

Although the Fuji and Norinchukin LIBOR notes provided for 20 quarterly payments to be paid over a 5-year period beginning July 2, 1990, Saba had received the $160 million cash portion of the sale proceeds immediately prior to the end of its March 31, 1990 taxable year. Taking the position that the maximum period over which payments could be received on the sale of the Chase PPNs was 6 years, Saba applied 1/6th of its basis in the Chase PPNs in computing its gain on the sales under section 15A.453-1(c), Temporary Income Tax Regs., supra. Saba reported the sale of the Chase PPNs on its Form 1065 for the year ended March 31, 1990, as follows:

| | |
|---|---|
| Cash Proceeds: | $160,000,000 |
| Cost: | 200,000,000 |
| Basis = 1/6 cost: | 33,333,333 |
| Gain: | $126,666,667 |

Saba allocated the gain reported on its Form 1065 for the tax year ended March 31, 1990, among its partners (per its Schedule K-1s) as follows:

|          | Percentage |              |
|----------|------------|--------------|
| Partner  | Interest   | Gain         |
| Skokie   | .5         | $633,333     |
| Brunswick| 9.5        | 12,033,334   |
| Sodbury  | 90.0       | 114,000,000  |
| Total    | 100.0      | $126,666,667 |

The $126,666,667 gain that Saba reported on its March 31, 1990 tax return was not included on Saba's audited or unaudited financial statements for the year ended March 31, 1990.

Saba invested the $160 million that it received on the sale of the Chase PPNs in time deposits and commercial paper. Saba acquired approximately $50 million of Brunswick commercial paper between September 20 and 26, 1990. Saba held Brunswick's commercial paper through April 3, 1991, when it contributed the commercial paper to SBC International Holdings, Inc. See discussion infra p. 44.

C.  McManaman's Tax Projections

On April 20, 1990, McManaman prepared a schedule entitled "FOREIGN PARTNERSHIP TAX UPDATE" in which he projected that Brunswick would realize capital losses of $80 million attributable to "FOREIGN PARTNERSHIP I" (Saba) and capital losses of $57 million attributable to "FOREIGN PARTNERSHIP II" (the yet to be formed Otrabanda partnership). In addition, McManaman projected that Brunswick would realize capital gains of $91 million attributable to the sales of its Technical businesses and Nireco stock, that such capital gains would be offset by

Brunswick's capital losses from its partnership investments, and that Brunswick would have $51 million in capital losses to carry back to taxable years 1987 through 1989. On April 25, 1990, McManaman presented his projections to Brunswick's Board of Directors.

D. Brunswick's Purchase of 50 Percent of Sodbury's Partnership Interest

During a July 13, 1990, Saba partnership meeting, Sodbury requested that the remaining partners purchase 50 percent of its interest in the partnership. Brunswick agreed to pay $92,452,227 in cash for 50 percent of Sodbury's partnership interest based in part upon Pepe's valuation of the Fuji and Norinchukin LIBOR notes. In notes dated July 13, 1990, Pepe valued the Fuji and Norinchukin LIBOR notes held by Saba at $36,213,588, and then added to that amount $2,035,000--the sum of the $1,500,000 private placement discount and an unidentified additional amount of $535,000. Pepe rounded the resulting figure of $38,248,588 up to $38,250,000. By valuing the Fuji and Norinchukin LIBOR notes in this fashion, Sodbury was relieved of the cost or private placement discount associated with the sale of the Chase PPNs.

After Brunswick's purchase of 50 percent of Sodbury's interest in Saba, Brunswick held a 54.5-percent partnership interest in Saba, Skokie held a .5-percent partnership interest, and Sodbury held a 45-percent partnership interest.

On July 13, 1990, Sodbury transferred the $92,452,227 received from Brunswick to ABN to be applied as a credit against its loan account.

E.  Brunswick-ABN Consulting Agreement

On July 3, 1990, Brunswick and ABN entered into an agreement under which ABN agreed to provide consulting services to Brunswick in exchange for a fee.  Brunswick charged the fees that it paid to ABN pursuant to the consulting agreement against the portion of Brunswick's Accrued Disposition Costs reserve account allocated to partnership activity.  Brunswick paid ABN a total of $750,000 pursuant to the consulting agreement:  $250,000 on or about July 10, 1990; $250,000 on or about February 26, 1991; and $250,000 on or about February 27, 1992.

F.  Payments on 4 LIBOR Notes

On July 2, 1990, Fuji and Norinchukin made timely LIBOR note payments to Saba of $1,115,320.33 and $1,113,372.36, respectively.  Saba included $49,882 of these payments in its interest income on its Form 1065 for the taxable year ended March 31, 1991.

G.  Distribution of 3 LIBOR Notes to Brunswick

On August 17, 1990, Saba distributed $24,016,789 in cash to Sodbury, $266,853 in cash to Skokie, and 2 Fuji LIBOR notes and 1 Norinchukin LIBOR note to Brunswick.  In notes dated August 17, 1990, Pepe valued the 3 LIBOR notes distributed to Brunswick by

first assigning a base value of $36,758,918 to all 4 of the Fuji and Norinchukin LIBOR notes and adding to that amount the $1,500,000 private placement discount and the $535,000 amount that first appeared in Pepe's notes dated July 13, 1990. Pepe's notes dated August 17, 1990, identify the $535,000 amount as a "fee". Pepe rounded the resulting figure of $38,793,918 up to $38,794,000 and multiplied that figure by the ratio of the total NPA of the retained Norinchukin LIBOR note ($25,765,000) to the NPA of all the LIBOR notes ($102,970,000). Pursuant to these computations, Pepe valued the Norinchukin LIBOR note that Saba retained at $9,707,000 and the 3 LIBOR notes that Saba distributed to Brunswick at $29,087,000.

Sodbury transferred the $24,016,789 that it received from Saba to ABN to be applied as a credit against its loan account.

H.  Brunswick's Sale of 3 LIBOR Notes

In August 1990, concurrent with Saba's distribution of the 3 LIBOR notes to Brunswick, Merrill Lynch was making arrangements for Brunswick to sell the LIBOR notes. On August 14, 1990, a representative of the Bank of Tokyo, Ltd. (BOT) prepared a memorandum seeking approval from BOT's head office to purchase the 3 LIBOR notes from Brunswick in connection with a structured transaction to be arranged by Merrill Lynch. On August 24, 1990,

Brunswick and Merrill Lynch executed a letter agreement appointing Merrill Lynch as Brunswick's exclusive agent to arrange for the sale of the 3 LIBOR notes.

On September 6, 1990, Brunswick sold the 3 LIBOR notes to BOT for $26,601,451. Brunswick determined that it incurred a capital loss on the sale of the LIBOR notes. First, Brunswick computed its inside basis in the 3 LIBOR notes by multiplying $166,666,667 ($200,000,000 (Saba's original cost basis in the Chase PPNs) less $33,333,333 (the portion of Saba's cost basis in the Chase PPNs used in computing Saba's gain on the sale of the PPNs)) by 75 percent to account for the fact that Brunswick had received 3 of the 4 LIBOR notes originally held by Saba. Under this formula, Brunswick determined that it had an inside basis in the LIBOR notes of $125,000,000. In the alternative, Brunswick computed its outside basis in Saba as of September 6, 1990, as follows:

| | |
|---|---|
| Contributions | $19,000,000 |
| Distributive share for 3/31/90 | |
| Capital gain | 12,033,334 |
| Income | 127,470 |
| Purchase of partnership interest | 92,452,227 |
| Total basis | $123,613,031 |

Brunswick determined that its basis in the 3 LIBOR notes was $123,613,031--the lesser of its outside basis in Saba or its inside basis in the 3 LIBOR notes.

On its consolidated Federal income tax return for 1990, Brunswick reported a net short-term capital loss of $84,978,246 attributable to Saba. The $84,978,246 net short-term capital loss consists of the difference between Brunswick's purported basis in the 3 LIBOR notes and the sales price of the notes, less Brunswick's distributive share of the gain reported by Saba on the sale of the Chase PPNs: ($123,613,031 - $26,601,451) - $12,033,334 = $84,978,246.

Brunswick reported a loss on its audited and unaudited financial statements on the sale of the 3 LIBOR notes in the amount of $2,485,549, which is the difference between the cash proceeds of $26,601,451 and the $29,087,000 value that Pepe assigned to the 3 LIBOR notes at the time that they were distributed. The $2,485,549 loss was recorded in the portion of Brunswick's Accrued Disposition Costs reserve account allocated to partnership activity. Brunswick's IPD and Tech Divestitures Analysis of Deferred Disposition Costs account number 2107265 reflects the above $2,485,549 loss.

On its consolidated Federal income tax return for 1990, Brunswick reported Skokie's distributive share of the gain reported by Saba on the sale of the Chase PPNs ($633,333) as other income, rather than capital gain. If Brunswick had reported Skokie's distributive share of the gain as capital gain

on its consolidated Federal income tax return, Brunswick would have reported a short-term capital loss attributable to Saba of $84,344,913.

I.   Partial Redemption of Sodbury's Partnership Interest

On September 14, 1990, Saba distributed $60,204,145 in cash to Sodbury in redemption of a 35-percent partnership interest. For purposes of determining the amount to be distributed in the redemption, Pepe valued the remaining Norinchukin LIBOR note held by Saba at $9,680,000.  The $9,680,000 amount included a $375,000 private placement discount (25 percent of the original $1,500,000 private placement discount) and $133,750 (25 percent of the unidentified $535,000 "fee").

After the September 14, 1990 distribution, Brunswick held a 89.181882-percent partnership interest in Saba, Skokie held an .8181818-percent partnership interest, and Sodbury held a 10-percent partnership interest.

On September 14, 1990, Sodbury transferred the $60,204,145 that it received from Saba to ABN to be applied as a credit against its loan account.

J.   Payments on Norinchukin LIBOR Note

Norinchukin made timely payments to Saba on the remaining LIBOR note between October 1990 and April 1991.  Saba amortized the LIBOR note payments for tax purposes and reported imputed interest as follows:

| Payment Date | LIBOR Note Payment | Principal | Imputed Interest |
|---|---|---|---|
| October 2, 1990 | $551,443 | $528,099 | $23,344 |
| January 2, 1991 | 548,356 | 514,425 | 33,931 |
| April 2, 1991 | 488,126 | 448,778 | 39,348 |

K. Transfer and Termination of 3 LIBOR Notes

On December 27, 1990, BOT assigned its rights under the Norinchukin LIBOR note that it had purchased from Brunswick to Banque Francaise du Commerce Exterieur (BFCE) for $7,510,040. On January 2, 1991, Fuji paid $16,063,182 to BOT in cancellation of the two Fuji LIBOR notes that BOT had purchased from Brunswick. On June 28, 1991, Norinchukin paid $7,040,954 to BFCE in cancellation of the Norinchukin LIBOR note.

L. Formation of SBC International Holdings, Inc. (SBC)

On April 3, 1991, Saba organized SBC International Holdings, Inc. (SBC). Saba transferred $744,109 in cash, $49,835,451 of Brunswick commercial paper, $27,902,067 of other commercial paper, and the remaining Norinchukin LIBOR note valued at $7,752,000 to SBC in exchange for all 100 shares of SBC's outstanding stock.

On April 3, 1991, Saba amended its partnership agreement to provide, among other things, that Sodbury would not pay any portion of SBC's Federal income taxes.

M.  Downgrade of Brunswick's Credit Rating

On June 6, 1991, Moody's announced that it was placing Brunswick's debt ratings under review.  On June 19, 1991, Moody's announced that it was downgrading Brunswick's long-term debt rating from Baa1 to Baa2.

N.  Dissolution of Saba

During a June 21, 1991, Saba partnership meeting, Brunswick informed the partnership that, due to a recent downgrading of Brunswick's credit rating, Brunswick would have to liquidate its investment in Saba in order to reduce the amount of its outstanding commercial paper and other borrowings.  On June 21, 1991, Saba transferred $1,161,928 to SBC as additional paid-in capital.  The following schedule lists SBC's assets as reflected on its June 21, 1991 unaudited financial statement:

| Item | Amount |
| --- | --- |
| Cash | $1,161,928 |
| Time deposits | 2,922,499 |
| Norinchukin LIBOR Note (as valued by Merrill Lynch) | 7,760,000 |
| Brunswick commercial paper | 49,787,895 |
| Non-Brunswick commercial paper | 26,696,262 |
| Accrued interest on Brunswick commercial paper | 73,757 |
| Accrued interest on non-Brunswick commercial paper | 54,744 |
| Accrued interest from time deposits | 931 |
| Total | $88,458,016 |

On June 21, 1991, Saba was dissolved.  For purposes of Saba's audited and unaudited financial statements, Brunswick was allocated $1,101,381, Skokie was allocated $10,104, and Sodbury was allocated $123,499 of Saba's income from April 1, 1991

through June 21, 1991. For tax purposes, Brunswick was allocated $190,177, Skokie was allocated $1,744, and Sodbury was allocated $21,325 of Saba's income from April 1, 1991 through June 21, 1991. These differences were reported on Saba's Form 1065 (Schedule M) for the period ended June 21, 1991.

Saba's partners received the following property in liquidation of their Saba partnership interests: (1) Brunswick received Saba's 100 shares of SBC stock; (2) Skokie received $811,541 in cash; and (3) Sodbury received $9,918,840 in cash.

On June 21, 1991, Sodbury's loan account with ABN was credited in the amounts of $4,946,172.46 and $2,000,000.

Brunswick filed SBC's Federal income tax return for the period April 3, 1991 through June 21, 1991, reporting taxable income of $1,054,460 and tax due of $358,516. Brunswick paid the tax due. Brunswick included SBC on its consolidated Federal income tax return for 1991. Brunswick did not report its receipt of, or any gain or loss from, the 100 shares of SBC stock that it received upon Saba's dissolution.

O.  Dissolution of Sodbury

On or about March 20, 1991, Sodbury paid dividends of $328 to both Pietermaai and Ronde Klip.  The dividends were transferred to ABN and were credited to Pietermaai's and Ronde Klip's loan accounts.

On June 21, 1991, ABN-Willemstad released all of its right, title, and interest in and to the collateral assigned to it under the February 26, 1990, pledge agreements between ABN, Pietermaai, and Sodbury and between ABN, Ronde Klip, and Sodbury.  Effective July 26, 1991, ABN exercised its options under the February 26, 1990, option agreements to buy Pietermaai's and Ronde Klip's holdings in Sodbury.

On July 26, 1991, Sodbury paid ABN $3,065,347, an amount representing Sodbury's total liabilities and stockholder's equity of $3,071,347 less $6,000 of capital.  On that same date, Sodbury's loan account with ABN was credited in the amount of $3,065,347.  This amount is reflected as an interim dividend on Sodbury's financial statement.

On July 29, 1991, Pietermaai and Ronde Klip each repurchased 3,000 shares of Sodbury stock from ABN for $1.  On the same date, an extraordinary meeting of Sodbury's shareholders was held, and it was resolved to dissolve Sodbury.  Curab, N.V., an entity controlled by ABN Trust, was appointed liquidator.

P.  SBC's Sale of Remaining Norinchukin LIBOR Note

On July 2, 1991, SBC, then Brunswick's subsidiary, sold the remaining Norinchukin LIBOR note via a Satisfaction and Termination Agreement with Norinchukin dated June 28, 1991. Norinchukin paid SBC $7,040,954 for the remaining note.  Merrill Lynch arranged the transaction.  Norinchukin's July 2, 1991, payment included a LIBOR note payment of $419,262.75 due on that same date.  SBC, through Brunswick, amortized the Norinchukin LIBOR note payment for tax purposes and reported imputed interest as follows:

| Payment Date | LIBOR Note Payment | Principal | Imputed Interest |
|---|---|---|---|
| July 2, 1991 | $419,263 | $377,684 | $41,579 |

Brunswick determined that SBC incurred a capital loss on the sale of the Norinchukin LIBOR note.  Brunswick computed SBC's basis in the Norinchukin LIBOR note by multiplying $166,666,667 ($200 million (original cost basis of the Chase PPNs) less $33,333,333 (the portion of cost basis of the Chase PPNs used in computing Saba's gain on the sale of the PPNs)) by 25 percent to account for the fact that SBC had received 1 of the 4 LIBOR notes originally held by Saba.  Under this formula, Brunswick determined that SBC's basis in the Norinchukin LIBOR note was $41,666,667.  Brunswick reported a long-term capital loss of $32,631,287 on its consolidated Federal income tax return for

1991 attributable to SBC's sale of the remaining Norinchukin LIBOR note. Brunswick reported a loss of $719,046 on its audited and unaudited financial statements attributable to the sale of the remaining Norinchukin LIBOR note. Brunswick charged the $719,046 loss to the portion of Brunswick's Accrued Disposition Costs reserve account allocated to partnership activity as part of a $758,213 entry.

Q. Termination of Chase Private Placement Notes

Between June 1990 and August 1990, Merrill Lynch exercised its option under a side agreement with Fuji and purchased $40 million of the $100 million principal amount of Chase PPNs that Fuji was holding. On February 25, 1991, Fuji elected to exercise the put option with respect to the remaining $60 million principal amount of the Chase PPNs. On April 17, 1991, Norinchukin elected to exercise the put option with respect to the $100 million principal amount of the Chase PPNs that it held.

V. Saba-Related Swaps

A. Fuji and Norinchukin Swaps

Merrill Lynch offered Fuji and Norinchukin structured transactions to be implemented in conjunction with their agreement to purchase the Chase PPNs from Saba for cash and LIBOR notes. In financial terminology, a "structured transaction" is one that combines two or more financial instruments or derivatives. Most structured transactions, like those in this

case, involve derivatives.  The structured transaction that Merrill Lynch offered to Fuji and Norinchukin consisted of two swaps:  (1) A basis swap related to the asset that the banks would be purchasing (the Chase PPNs), and (2) a hedge swap related to the liability that the banks would be undertaking in connection with the issuance of the LIBOR notes.  In general terms, a swap is an agreement between two parties to exchange one set of payments for another.  For example, one party might exchange payments based on a floating interest rate for a payment based on a fixed interest rate.

Economically, the Fuji and Norinchukin swaps provided the banks with both an asset and a liability that were attractively priced compared to other alternatives in the market.  Merrill Lynch was the counterpart in the swaps.

The Fuji and Norinchukin basis swaps had the effect of passing to Merrill Lynch the interest payments that accrued on the Chase PPNs from March 21, 1990 through the date that the Chase PPNs were terminated.  Further, Merrill Lynch made payments to Fuji and Norinchukin which, when considered in conjunction with the purchase of the Chase PPNs, enhanced Fuji's and Norinchukin's returns from the Chase PPNs.  The net cash flows resulting from the combination of the Chase PPNs with the basis swaps were tied to LIBOR--the interest rate index under which Fuji and Norinchukin normally conducted business.

The Fuji and Norinchukin hedge swaps were designed to allow the banks to transform their liabilities under the LIBOR notes to an amortizing liability at an interest rate below LIBOR. Consequently, the Fuji and Norinchukin hedge swaps effectively converted the transactions, from the banks' perspective, to synthetic funding below the banks' funding rates. Further, the banks' payments under the hedge swaps were much less volatile than the payments required to be made under the LIBOR notes.

B.  Sodbury-ABN-Merrill Lynch Swaps

Sodbury entered into interest rate swaps with ABN and ABN entered into mirror swaps with Merrill Lynch to reduce Sodbury's and ABN's interest rate risk associated with the 4 LIBOR notes held by Saba.

C.  Bank of Tokyo Swaps

Effective September 6, 1990, Merrill Lynch and BOT executed a swap in connection with BOT's purchase of the 3 LIBOR notes from Brunswick. The swap, which was designed to replicate the economic effect of investing in an amortizing loan that paid a margin over LIBOR, effectively converted the purchase of the LIBOR notes, from BOT's perspective, to a synthetic amortizing asset at a rate above BOT's normal financing rate.

D.  Banque Francaise du Commerce Exterieur Swaps

Effective January 2, 1991, Merrill Lynch and BFCE executed a swap in connection with BOT's assignment of the Norinchukin LIBOR

note to BFCE.  The swap, which was designed to replicate the economic effect of investing in an amortizing loan that paid a margin over LIBOR, effectively converted the purchase of the LIBOR Note, from BFCE's perspective, to a synthetic amortizing asset at a rate above LIBOR.

E.  Brunswick Swaps

On April 5, 1990, Brunswick and Merrill Lynch entered into an Interest Rate and Currency Exchange Agreement to govern anticipated swap transactions between them.  On July 16, 1990, concurrent with Brunswick's purchase of 50 percent of Sodbury's interest in Saba, Brunswick and Merrill Lynch entered into a swap agreement.  Brunswick used the swap to hedge a substantial percentage of its interest in the LIBOR notes held by Saba.

On August 20, 1990, concurrent with the Saba's distribution of 3 LIBOR notes to Brunswick, Brunswick and Merrill Lynch entered into a second swap agreement.  Brunswick used the swap to hedge a substantial percentage of its interest in the LIBOR notes.

On September 6, 1990, Brunswick and Merrill Lynch partially terminated the July 16, 1990, swap in connection with Brunswick's sale of the 3 LIBOR notes to BOT.  The July 16, 1990, swap was completely terminated on July 2, 1991, following SBC's sale of the remaining Norinchukin LIBOR note.  On September 6, 1990, Brunswick and Merrill Lynch partially terminated the August 20,

1990, swap due to Brunswick's sale of the 3 LIBOR notes. This swap was completely terminated on July 2, 1991, following SBC's sale of the remaining Norinchukin LIBOR note.

On September 14, 1990, concurrent with the partial redemption of Sodbury's partnership interest, Brunswick and Merrill Lynch entered into a third swap. Brunswick used the swap to hedge a substantial percentage of its interest in the remaining Norinchukin LIBOR note held by Saba. This swap was completely terminated on July 2, 1991, following SBC's sale of the remaining Norinchukin LIBOR note.

VI. Otrabanda Investerings Partnership

A. Structure

On June 13, 1990, Brunswick, through Mayer, Brown & Platt, requested that Merrill Lynch arrange a second partnership with a structure slightly different from Saba. Brunswick requested that the foundations (stichtings) own the stock of subsidiary #1 which in turn would own the stock of subsidiary #2. Brunswick requested that subsidiary #1 obtain a loan from ABN and use the proceeds to capitalize subsidiary #2 with equity and that subsidiary #2 act as the third partner in the new partnership. On June 20, 1990, Brunswick and Merrill Lynch entered into a letter agreement under which Merrill Lynch agreed to serve as

Brunswick's adviser regarding Otrabanda in exchange for a fee.
On or about September 5, 1990, Brunswick paid a $250,00 fee to
Merrill Lynch.

By memorandum dated June 19, 1990, den Baas informed ABN's
Risk Management Department that Brunswick was interested in
forming a second partnership.  den Baas' memorandum stated in
pertinent part:

> although the loan spread will be 30 bps. the
> transaction will yield 85 bps. over LIBOR (the
> difference to be paid separately).  Total remuneration
> $600,000 excluding the Trust fee.

> The previous deal has been unwound ahead of schedule
> and outstandings per June 30, 1990 are $25mm.
> Brunswick is in the process of divesting more of its
> subsidiaries than originally planned and expects to
> generate more capital gains than covered by the first
> transaction.  Therefore they requested ABN Trust
> Curacao to create a new SPC for a second transactions
> with the same parameters as before.

> We will be brought down from $135mm. within three
> months to appr. $20mm. and then to $10mm. before year-
> end.  The total term of the transaction is anticipated
> for one year with a maximum term of 1.5 years.

> We are in the process of further syndicating present
> outstandings in Willemstad to such a level that this
> transaction will not bring us over the agreed upon
> level of $2 bln. per June 30, 1990.  This transaction
> will NOT be put on the books if this attempt is
> unsuccessful and by no means will the maximum
> outstandings be more than the $2 bln.

> *     *     *     *     *     *     *

> The calendar for this transaction will look as follows:

> Last week of June purchase of the private placements
> for a total amount of $150mm.

Last week of July sale of these private placements for cash ($120mm.) and installment note issued by AA or better rated bank, with NPV of $30mm. Cash will be invested in C.P. rated A-1/P-1 with a maximum of $20mm. per name and a maximum maturity of 60 days. This to be invested by ABN Trust and held by ABN New York.

In August the SPC's interest will be reduced to $50mm. with a further reduction in early September to $20mm.

In December the SPC will reduce its involvement further to $10mm. which will be reduced fully to zero in July of 1991.

On June 19, 1990, ABN's North Atlantic Credit Committee recommended approval of the second partnership "IN ACCORDANCE WITH PREVIOUS ADVICES". On June 22, 1990, ABN's Risk Management Department approved the transaction so long as ABN would have the right to liquidate the portfolio if its interest in the partnership were not reduced according to the proposed schedule.

B.  Bartolo Corporation

On June 20, 1990, ABN established two stichtings, Rocky Foundation (Rocky) and Jasper Foundation (Jasper).

On June 20, 1990, Bartolo Corporation, N.V. (Bartolo) was incorporated in Curacao, Netherlands Antilles. ABN Trust was the sole managing director of Bartolo. At the time that Bartolo was incorporated, Rocky and Jasper each received one-half or 3,000 shares of the 6,000 shares of Bartolo common stock authorized to be issued. Each Bartolo share had a par value of $1 for a total

capitalization of $6,000. Bartolo paid ABN Trust $28,338.94, invoiced as a $25,000 fee for management, $3,335 for incorporation costs, and $3 in expenses.

On June 25, 1990, Clavicor Corporation, N.V. (Clavicor) was incorporated in Curacao, Netherlands Antilles. ABN Trust was the sole managing director of Clavicor. At the time that Clavicor was incorporated, Rocky and Jasper each received one-half or 3,000 shares of the 6,000 shares of Clavicor common stock authorized to be issued. Each Clavicor share had a par value of $1 for a total capitalization of $6,000. Clavicor paid ABN Trust $6,013, invoiced as a $3,500 fee for management, $2,500 in incorporation costs, and $13 in expenses.

On June 25, 1990, Rocky and Jasper transferred all 6,000 shares of Bartolo to Clavicor. Bartolo was organized to serve as a general partner in Otrabanda because ABN was not interested in assuming the unlimited liability of a general partner and the funding that ABN would provide to Bartolo could be syndicated.

C.  Otrabanda Organizational Meeting

By partnership agreement dated June 20, 1990, Brunswick, Skokie, and Bartolo formed Otrabanda as a general partnership under the laws of the State of New York. The partners agreed that Otrabanda would maintain its principal place of business in Curacao, Netherlands Antilles.

The partnership agreement stated that the partnership was being organized "for the object and purpose of making investments in notes, bonds, debentures, and other interest bearing instruments, owning, managing, and supervising such investments, sharing the profits and losses therefrom, and engaging in such activities necessarily incidental or ancillary thereto."  The partnership agreement further stated that the partnership was being organized to enable Brunswick and Skokie "to reduce their credit risk exposure on investments while obtaining a yield in excess of what they could obtain from U.S. treasury securities" and to permit Bartolo "to earn a rate of return which reflects the additional credit risk it may incur on Partnership investments."

The partnership agreement provided for the payment of "preferred amounts" from partnership income.  In particular, partnership income would be allocated on a quarterly basis, first to Brunswick and Skokie in an amount equal to a noncompounded per annum return on the daily amounts of their unrecovered capital at a rate equal to the Treasury bill rate plus 10 basis points, and then to Bartolo in an amount equal to a noncompounded per annum return on the daily amounts of its unrecovered capital at a rate equal to LIBOR plus 5 basis points.  Any remaining partnership income would be allocated to the partners in proportion to their partnership percentages.

- 58 -

    The partnership agreement stated that an act of the
partnership committee would require the vote or consent of
partners whose aggregate partnership percentages were not less
than 95 percent.

    By letter dated June 20, 1990, Otrabanda engaged Fides to
perform certain administrative and investment management
services.  By letter dated June 20, 1990, Otrabanda entered into
an indemnity agreement with Fides.  During 1990 through 1991,
Otrabanda made the following payments to Fides:

| Date | Amount |
|------|--------|
| September 6, 1990 | $50,822.79 |
| November 14, 1990 | 1,471.75 |
| February 14, 1991 | 1,742.61 |
| March 15, 1991 | 2,390.15 |
| June 21, 1991 | 1,028.01 |

    On June 21, 1990, Brunswick representatives O'Brien and
Zelisko attended Otrabanda's organizational meeting in Bermuda.
ABN's representative, de Beer, participated in the meeting by way
of telephone conference call.

    By letter agreement dated June 21, 1990, Otrabanda engaged
Merrill Lynch as its financial adviser.  The June 21, 1990,
letter does not state the amount of Merrill Lynch's fee for such
services.  Merrill Lynch expected to be compensated for its
services (at least in part) by acting as the dealer in
transactions with Otrabanda.

On June 25, 1990, Skokie executed a promissory note evidencing a loan of $1,500,000 from Brunswick.  On November 1, 1990, Skokie made a loan repayment to Brunswick in the amount of $354,522.67.  On June 21, 1991, Skokie made a loan repayment to Brunswick in the amount of $741,777.70.  After this second payment, the outstanding balance of the loan was $403,699.63.

On June 25, 1990, ABN-Willemstad and Clavicor entered into a Revolving Credit Agreement (RCA) under which ABN-Willemstad agreed to make available to Clavicor one or more loans in the aggregate principal amount of $150 million.  The RCA was to expire no later than June 24, 1991.  By agreements dated June 25, 1990, Rocky and Jasper pledged their 6,000 shares of Clavicor to ABN-Willemstad as security for the RCA.  On June 25, 1990, ABN-Willemstad and Clavicor entered into a Subordinated Loan Agreement (SLA) under which ABN-Willemstad agreed to loan Clavicor $15 million, subordinated to the RCA.  According to the SLA, the loan was not to bear interest, unless the outstanding principal was not paid on the expiration date.

By Option Agreement dated June 25, 1990, Rocky and Jasper each granted ABN the irrevocable option to purchase up to 100 percent of their Clavicor shares at par.

On June 25, 1990, the Otrabanda partners made the following capital contributions to the partnership:

|  | Capital Contribution | Percentage Interest |
|---|---|---|
| Brunswick | $13,500,000 | 9.0 |
| Skokie | 1,500,000 | 1.0 |
| Bartolo | 135,000,000 | 90.0 |
|  | $150,000,000 | 100.0 |

The partners' June 25, 1990, capital contributions were deposited into Otrabanda's bank account at ABN-New York.

Bartolo's initial capital contribution to Otrabanda came from a loan from Clavicor. Clavicor was able to provide $135 million to Bartolo through funds obtained under its RCA with ABN-Willemstad.

D. Miscellaneous Fees

Otrabanda maintained certain audited and unaudited financial statements. Otrabanda's audited financial statements were prepared by Arthur Andersen. Otrabanda made the following payments to Arthur Andersen and Cravath, Swaine & Moore for professional fees:

| Date | Amount | Payee |
|---|---|---|
| November 14, 1990 | $71,524.25 | Cravath |
| January 7, 1991 | 10,000.00 | Arthur Andersen |
| June 21, 1991 | 13,165.19 | Cravath |

The $71,524.25 fee paid to Cravath on November 14, 1990, included a fee for professional services of $68,000. In a December 2, 1994 memorandum from Cravath to Brunswick, Cravath itemized the $68,000 charge for professional services as follows:

The $68,000.00 fee was for negotiation and drafting of the documentation, and for other related

services, in connection with: (a) the formation of Otrabanda ($12,215.57), (b) the purchase by Otrabanda of certain certificates of deposit ($12,537.03), (c) the sale by Otrabanda of such certificates ($23,193.51), (d) the assignment of Otrabanda's right to receive payments from such sale ($6,209.58) and (e) other related matters ($13,844.31). * * *

Otrabanda paid commercial paper fees as follows:

| Date of Payment | Amount |
|---|---|
| August 10, 1990 | $385 |
| September 7, 1990 | 605 |
| October 5, 1990 | 315 |
| November 6, 1990 | 645 |
| December 7, 1990 | 575 |
| January 19, 1991 | 215 |
| February 14, 1991 | 315 |
| March 15, 1991 | 330 |
| April 17, 1991 | 290 |
| May 31, 1991 | 195 |
| June 18, 1991 | 100 |

VII.   Otrabanda Transactions

A.   Otrabanda's Purchase of Certificates of Deposit

On June 29, 1990, Otrabanda purchased from Industrial Bank of Japan (IBJ) 4 newly issued $25 million floating-rate certificates of deposit (IBJ CDs) for a total principal amount of $100 million.  The IBJ CDs included a European-style put option exercisable at par plus accrued interest by the holder on January 15, 1992, and were due to mature on June 21, 1995.  The IBJ CDs bore interest at 8.25 percent for the first month and at 1-month LIBOR minus 12.5 basis points thereafter.

At the time the IBJ CDs were issued, IBJ was rated Aaa by Moody's. The IBJ CDs were not registered under the Securities Act of 1933 and were not traded on an established securities market.

On July 18, 1990, IBJ made a timely interest payment of $435,416.67 to Otrabanda with respect to the IBJ CDs. (IBJ's July 18, 1990, interest payment was for $458,333.33, which exceeded the interest amount due by $22,916.66. On July 31, 1990, the excess interest was reversed.) Otrabanda included this interest payment in its interest income on its Form 1065 for the taxable year ended July 31, 1990.

B. Otrabanda's Sale of Certificates of Deposit

Brunswick and Merrill Lynch discussed an investment in an instrument analogous to an inverse floater, that would increase in value as interest rates declined and decrease in value as interest rates increased. Otrabanda did not purchase such an instrument.

On July 24, 1990, Otrabanda held a partnership meeting at Merrill Lynch's office in Toronto. Zelisko attended the meeting on behalf of Brunswick and Skokie, while de Beer from ABN and Taylor from Merrill Lynch participated in the meeting by way of telephone conference call. The partnership committee adopted a resolution, upon the advice of Merrill Lynch, authorizing and directing the sale of the IBJ CDs for consideration consisting of

cash and contingent payments based upon LIBOR.  The resolution does not explain the basis for Merrill Lynch's recommendation to sell the IBJ CDs.

On July 27, 1990, Otrabanda sold its IBJ CDs to Sumitomo Bank Capital Markets (Sumitomo) for $80 million in cash and 4 installment purchase agreements dated July 27, 1990 (Sumitomo LIBOR notes) each with a stated NPA of $13,349,000 for a total NPA of $53,396,000.

The sale of the IBJ CDs to Sumitomo included $201,562 of interest that had accrued on the IBJ CDs for the period from July 18, 1990 through July 27, 1990.  Otrabanda included this amount in interest income on its Form 1065 for the taxable year ended July 31, 1990.

Each of the Sumitomo LIBOR notes that Otrabanda received provided for 20 quarterly payments of an amount equal to 3-month LIBOR, generally set 3 months preceding the payment date, multiplied by (1) the NPA of each note and (2) a fraction consisting of the number of days between payment dates divided by 360.  Payments on the Sumitomo LIBOR notes were to commence on November 1, 1990, and to conclude on August 1, 1995.  The effective date of the Sumitomo LIBOR notes was August 1, 1990.

Otrabanda sold the IBJ CDs at 99.25 percent of par, or at a private placement discount of $750,000 (75 basis points x $100,000,000).  Pepe of Merrill Lynch determined the origination

value of the Sumitomo LIBOR notes based on the sum of the par value of the IBJ CDs plus accrued interest, less the private placement discount and the cash received upon the sale of the IBJ CDs, as follows:

| | |
|---|---|
| Par value of IBJ CDs | $100,000,000 |
| Plus accrued interest (through 7/29) | 201,562 |
| | 100,201,562 |
| Less private placement discount | (750,000) |
| Net amount | 99,451,562 |
| Less cash received | (80,000,000) |
| Merrill Lynch origination value | $19,451,562 |

Sumitomo valued the LIBOR notes that it had issued to Otrabanda at $18,905,565.

According to Pepe's computations, Otrabanda received consideration totaling $99,451,562 consisting of the $80 million in cash and the Sumitomo LIBOR notes with a present value of $19,451,562. The difference between the par value of the IBJ CDs plus accrued interest ($100,201,562) and the total consideration that Otrabanda received ($99,451,562) reflects the $750,000 private placement discount on the sale of the IBJ CDs.

Contrary to the origination value that Pepe assigned to the Sumitomo LIBOR notes, Otrabanda carried the LIBOR notes on its audited and unaudited financial statements at their cost of $20,201,562--the present value of the LIBOR notes of $19,451,562, plus the $750,000 private placement discount on the sale of the IBJ CDs. Otrabanda adopted this approach based upon advice from Merrill Lynch. As discussed in detail below, the private

placement discount on the sale of the IBJ CDs eventually was borne solely by Brunswick following the distribution and sale of the LIBOR notes.

A portion of the $750,000 private placement discount on the sale of the IBJ CDs was attributable to the CDs' lack of liquidity.  If Otrabanda had invested directly in LIBOR notes, as opposed to first purchasing the IBJ CDs, Otrabanda could have avoided the portion of the $750,000 discount attributable to the CDs' lack of liquidity.

O'Brien understood that Otrabanda had invested in the IBJ CDs, prior to its investment in the LIBOR notes, to ensure that the transactions would be treated for tax purposes as CINS transactions.  The IBJ CDs were not readily tradeable on an established market.  In addition, because the Sumitomo LIBOR notes provided for 20 variable, quarterly payments, Otrabanda could not determine the aggregate selling price of the IBJ CDs by the end of its July 31, 1990 taxable year.  Consequently, Otrabanda reported the sale of the IBJ CDs as an "installment sale" under section 453(b).  Otrabanda computed its gain on the sale of the IBJ CDs through a ratable allocation (or recovery) of its basis in the IBJ CDs under section 15A.453-1(c), Temporary Income Tax Regs., 46 Fed. Reg. 10711 (Feb. 4, 1981).

Although the Sumitomo LIBOR notes provided for 20 quarterly payments to be paid over a 5-year period beginning November 1,

1990, Otrabanda had received the $80 million cash portion of the
sale proceeds immediately prior to the end of its July 31, 1990
taxable year.  Taking the position that the maximum period over
which payments could be received on the sale of the IBJ CDs was 6
years, Otrabanda applied 1/6th of its basis in the IBJ CDs in
computing its gain on the sale under section 15A.453-1(c),
Temporary Income Tax Regs.  Otrabanda reported the sale of the
IBJ CDs on its Form 1065 for the tax year ended July 31, 1990, as
follows:

| | |
|---|---|
| Cash Proceeds: | $80,000,000 |
| Cost: | 100,000,000 |
| Basis = 1/6 cost: | (16,666,666) |
| Gain | $63,333,334 |

Otrabanda allocated the gain reported on its Form 1065 for
the tax year ended July 31, 1990, among its partners (per
Schedule K-1s) as follows:

| Partner | Percentage Interest | Gain |
|---|---|---|
| Skokie | 1.0 | $633,333 |
| Brunswick | 9.0 | 5,700,000 |
| Bartolo | 90.0 | 57,000,001 |
| Total | 100.0 | $63,333,334 |

The $63,333,334 that Otrabanda reported on its July 31, 1990 tax
return was not included in Otrabanda's audited and unaudited
financial statements for the year ended July 31, 1990.

Otrabanda invested the $80 million that it received on the
sale of the IBJ CDs in time deposits and commercial paper.

Otrabanda acquired approximately $40 million of Brunswick commercial paper between December 5 and 7, 1990. Otrabanda held Brunswick commercial paper until April 3, 1991, when it contributed its commercial paper holdings to OBC International Holdings, Inc. See discussion <u>infra</u> p.72.

    C.  <u>Brunswick's Purchase of 50 Percent of Bartolo's Partnership Interest</u>

On October 11, 1990, Brunswick purchased 50 percent of Bartolo's interest in Otrabanda for $69,239,696 in cash. For purposes of computing the price to be paid for Bartolo's interest, the partners relied upon Pepe to assign a value to the Sumitomo LIBOR notes. Pepe valued the Sumitomo LIBOR notes at $20,016,983, and then added to that amount the $750,000 private placement discount and rounded up to derive a value of $20,767,000. After Brunswick's purchase of 50 percent of Bartolo's partnership interest, Brunswick held a 54.0009108-percent partnership interest in Otrabanda, Skokie held a .9990892-percent partnership interest, and Bartolo held a 45-percent partnership interest.

On October 11, 1990, Bartolo transferred the $69,239,696 received from Brunswick to Clavicor. On October 11, 1990, Clavicor transferred the $69,239,696 to ABN to be credited against its loan account.

D.  Payments on LIBOR Notes

On November 1, 1990, Sumitomo made a timely payment of $1,085,255.84 to Otrabanda on the LIBOR notes.  Otrabanda amortized this payment for tax purposes and reported $23,907 of the payment as imputed interest on its Form 1065 for the taxable year ended June 21, 1991.

E.  Distribution of LIBOR Notes to Brunswick

On November 1, 1990, Otrabanda distributed $354,523 in cash to Skokie, $15,968,064 in cash to Bartolo, and the 4 Sumitomo LIBOR notes to Brunswick.  The partners relied on Pepe to determine the value of the Sumitomo LIBOR notes.  Pepe assigned a value of $19,162,000 to the Sumitomo LIBOR notes, inclusive of the $750,000 private placement discount on the sale of the IBJ CDs.  By valuing the Sumitomo LIBOR notes in this fashion, Bartolo was relieved of the cost or private placement discount associated with the sale of the IBJ CDs.

On November 1, 1990, Bartolo transferred $16,100,000 to Clavicor, including the $15,968,064 received in the Otrabanda distribution.  On November 1, 1990, Clavicor transferred $16,083,986 of the $16,100,000 to ABN to be credited against its loan account.

F.  Brunswick's Sale of LIBOR Notes

On November 5, 1990, Brunswick and Merrill Lynch executed a letter agreement under which Merrill Lynch agreed to serve as Brunswick's exclusive agent to arrange for the sale of the 4 Sumitomo LIBOR notes.

On November 28, 1990, Brunswick sold the 4 Sumitomo LIBOR notes to BFCE for $17,458,827.  Merrill Lynch arranged the transaction.  Brunswick determined that it incurred a capital loss on the sale of the Sumitomo LIBOR notes.  Brunswick determined that its basis in the 4 LIBOR notes was equal to the unused portion of Otrabanda's basis in the IBJ CDs or $83,333,333: ($100,000,000 (Otrabanda's cost basis in the IBJ CDs) less $16,666,667 (the portion of Otrabanda's cost basis used in computing Otrabanda's gain on the sale of the IBJ CDs)).

On its consolidated Federal income tax return for 1990, Brunswick reported a net short-term capital loss of $60,174,506 attributable to Otrabanda.  The $60,174,506 net short-term capital loss consists of the difference between Brunswick's purported basis in the 4 Sumitomo LIBOR notes and the sales price of the notes, less Brunswick's distributive share of the gain reported by Otrabanda on the sale of the IBJ CDs: ($83,333,333 - $17,458,827) - $5,700,000 = $60,174,506.

On its consolidated Federal income tax return for 1990, Brunswick reported Skokie's distributive share of the gain

reported by Otrabanda on the sale of the IBJ CDs ($633,333) as other income, rather than capital gain.  If Brunswick had reported Skokie's distributive share of the gain as capital gain on its consolidated Federal income tax return, Brunswick would have reported a short-term capital loss attributable to Otrabanda of $59,541,173.

For financial reporting purposes, Brunswick reported a loss of $1,703,173 on the sale of the 4 Sumitomo LIBOR notes.  The $1,703,173 loss represents the difference between the cash proceeds of $17,458,827 from the sale and the $19,162,000 present value that Merrill Lynch assigned to the Sumitomo LIBOR notes on the date that they were distributed to Brunswick.  The $1,703,173 loss was recorded in the portion of Brunswick's Accrued Disposition Costs reserve account allocated to partnership activity.

G.  Partial Redemption of Bartolo's Partnership Interest

On December 4, 1990, Otrabanda held a partnership meeting and the partners agreed that the partnership would partially redeem Bartolo's interest in the partnership.  On the same date, Otrabanda distributed $46,370,431 in cash to Bartolo in redemption of a 35-percent partnership interest.  On December 4, 1990, Bartolo transferred the $46,370,431 plus $34,569 to Clavicor, and Clavicor transferred the full amount to ABN to be applied as a credit against its loan account.

After the December 4, 1990 distribution, Brunswick held a 88.3651268-percent partnership interest in Otrabanda, Skokie held a 1.6348732-percent partnership interest, and Bartolo held a 10-percent partnership interest.

On December 4, 1990, Brunswick, Skokie, and Bartolo also agreed to amend the Otrabanda partnership agreement to provide that an act of the partnership committee would only require the vote or consent of partners whose aggregate partnership percentages were not less than 90 percent. This amendment had the practical effect of vesting Brunswick with control of Otrabanda inasmuch as Brunswick's and Skokie's aggregate partnership percentage interest was exactly 90 percent.

On December 10, 1990, Brunswick paid Bartolo $645,000 in cash. It appears that this payment represents the price that Brunswick paid to obtain control of Otrabanda. The $645,000 amount was recorded in the portion of Brunswick's Accrued Disposition Costs reserve account allocated to partnership activity. Brunswick Corporation Posting Cycle Journal Entry No. 12-79 states that the $645,000 represents "fees due to ABN for Otrabanda Partnership." On December 11, 1990, Bartolo transferred the $645,000 to Clavicor and Clavicor transferred the $645,000 to ABN to be applied as a credit to its loan account.

H.  Formation of OBC International Holdings, Inc.

On April 3, 1991, Otrabanda organized OBC International Holdings, Inc. (OBC).  Otrabanda transferred $98,734 in cash, $39,892,597 of Brunswick's commercial paper, and $26,435,369 of other commercial paper to OBC in return for all of OBC's outstanding stock.  On April 3, 1991, Otrabanda amended its partnership agreement to provide, among other things, that Bartolo would not pay any portion of OBC's Federal income taxes. Brunswick filed OBC's Federal income tax return for the period April 3 through June 21, 1991.  This return reflects taxable income of $891,134 and a tax due of $302,986.  Brunswick paid the tax due.

I.  Dissolution of Otrabanda

During a June 21, 1991, Otrabanda partnership meeting, Brunswick informed the partnership that, due to a recent downgrading of Brunswick's credit rating, Brunswick would have to liquidate its investment in Otrabanda in order to reduce the amount of its outstanding commercial paper and other borrowings. As previously mentioned, on June 19, 1991, Moody's had downgraded Brunswick's long-term debt rating from Baa1 to Baa2.  See supra p. 45.  O'Brien proposed that Otrabanda be dissolved.

For purposes of Otrabanda's audited and unaudited financial statements, Brunswick was allocated $3,166,221, Skokie was allocated $82,024, and Bartolo was allocated $3,289,820 of

Otrabanda's income from August 1, 1990, through June 21, 1991.

For tax purposes, Brunswick was allocated $2,587,763, Skokie was allocated $67,040, and Bartolo was allocated $2,688,779 of Otrabanda's income from August 1, 1990, through June 21, 1991. These differences were reported on Otrabanda's Form 1065, Schedule M, for the period ended June 21, 1991.

On June 21, 1991, Otrabanda was dissolved. Otrabanda's partners received the following property in liquidation of their interests in Otrabanda: (1) Brunswick received 99.265361541 shares of OBC stock; (2) Skokie received .734638459 shares of OBC stock plus cash of $741,778; and (3) Bartolo received cash of $7,562,179.

On June 21, 1991, OBC held the following assets:

| Item | Amount |
|---|---|
| Time deposits | $633,979 |
| Brunswick commercial paper | 39,856,500 |
| Non-Brunswick commercial paper | 26,787,631 |
| Accrued Interest--Brunswick commercial paper | 15,375 |
| Accrued Interest--non-Brunswick commercial paper | 24,152 |
| Accrued Interest from time deposits | 197 |
| Total | $67,317,834 |

Brunswick treated OBC as part of its consolidated group on its Federal income tax return for the fiscal year ended June 21, 1991. Brunswick did not report its receipt of, or any gain or loss from, the 100 shares of OBC stock received from Otrabanda on its Form 1120 for the 1991 tax year.

J.  Dissolution of Bartolo

On March 20, 1991, Clavicor paid a dividend of $494 to Jasper and Rocky.

On June 21, 1991, ABN-Willemstad released all of its right, title, and interest in and to the collateral assigned to it under the June 25, 1990, pledge agreements between ABN, Jasper, and Clavicor and between ABN, Rocky, and Clavicor.

Effective July 26, 1991, ABN exercised its options under the June 25, 1990, option agreements with Rocky and Jasper to buy their holdings in Clavicor.  On July 26, 1991, Clavicor paid ABN $859,917 representing Clavicor's total stockholder's equity.

On July 29, 1991, Jasper and Rocky repurchased the 6,000 shares of Clavicor from ABN for $1.  Clavicor was dissolved on the same date.  Curab, N.V., an entity controlled by ABN Trust, was appointed liquidator.

On July 29, 1991, Bartolo declared a dividend of $4,795,973, even though its net assets only consisted of $287,404.  Bartolo had previously paid $4,514,569 to Clavicor in multiple payments; Clavicor had then paid the $4,514,569 to ABN in multiple payments.  Bartolo was dissolved on July 29, 1991.  Curab, N.V. was appointed liquidator.

K. <u>Termination of the 4 LIBOR Notes</u>

On August 1, 1991, the 4 Sumitomo LIBOR notes held by BFCE were terminated in exchange for Sumitomo's payment of $15,223,523 to BFCE.

L. <u>Termination of the IBJ CDs</u>

On August 14, 1990, Sumitomo transferred the IBJ CDs to Sumitomo Bank Limited, Cayman Branch (Sumitomo Cayman). Sumitomo Cayman elected to exercise its put option with respect to the IBJ CDs effective January 15, 1992.

VIII. <u>Otrabanda-Related Swaps</u>

A. <u>Otrabanda Swap</u>

On June 29, 1990, concurrent with Otrabanda's purchase of the IBJ CDs, Otrabanda entered into an interest rate swap with Merrill Lynch. The swap, which was used to transform Otrabanda's return on the IBJ CDs from a floating LIBOR-based rate to one based on Treasury bills, was terminated on July 27, 1990, concurrent with Otrabanda' sale of the IBJ CDs.

B. <u>Sumitomo Swaps</u>

Merrill Lynch offered Sumitomo a structured transaction in connection with its purchase of the IBJ CDs for cash and LIBOR notes. In particular, Merrill Lynch and Sumitomo executed a swap that provided Sumitomo with both an asset and liability that were attractively priced versus other alternatives in the market. The Sumitomo swap was designed to replicate the economic effect of

partly financing the purchase of the IBJ CDs with a conventional amortizing loan and effectively converted the transaction, from Sumitomo's perspective, to synthetic funding below Sumitomo's funding rates.  Further, Sumitomo's payments under the hedge swap were much less volatile than the payments required to be made under the LIBOR notes.

C.  Bartolo-ABN-Merrill Lynch Swaps

Bartolo entered into interest rate swaps with ABN and ABN entered into mirror swaps with Merrill Lynch to reduce Bartolo's and ABN's interest rate risk associated with the 4 Sumitomo LIBOR notes held by Otrabanda.

D.  Banque Francaise du Commerce Exterieur Swaps

Merrill Lynch offered BFCE a swap in connection with BFCE's purchase of the 4 LIBOR notes from Brunswick.  The Merrill Lynch-BFCE swap, which was designed to replicate the economic effect of investing in an amortizing loan that paid a margin over LIBOR, effectively converted the purchase of the LIBOR notes, from BFCE's perspective, to a synthetic amortizing asset at a rate above BFCE's financing rate.

E.  Brunswick Swaps

On October 11, 1990, concurrent with Brunswick's purchase of 50 percent of Bartolo's partnership interest in Otrabanda, Brunswick and Merrill Lynch entered into a swap agreement.  On November 1, 1990, concurrent with the partial redemption of

Bartolo's partnership interest in Otrabanda, Brunswick and Merrill Lynch entered into a second swap agreement. Brunswick used these swaps to hedge a substantial percentage of its interest in the Sumitomo LIBOR notes.

On November 28, 1990, the swaps that Brunswick and Merrill Lynch entered into on October 11, 1990, and November 1, 1990, were completely terminated upon Brunswick's sale of the 4 Sumitomo LIBOR notes to BFCE.

IX. Saba's and Otrabanda's Tax Returns

Saba filed Forms 1065 (U.S. Partnership Return of Income) for the years ending March 31, 1990, March 31, 1991, and June 21, 1991. Brunswick prepared the returns as Saba's tax matters partner.

Otrabanda filed Forms 1065 (U.S. Partnership Return of Income) for the years ending July 31, 1990, and June 21, 1991. Brunswick prepared the returns as Otrabanda's tax matters partner.

X. Brunswick's Partnership Expenses

A. Transaction Costs

Petitioner retained Clifford W. Smith, Jr. (Smith), Professor of Finance at the William E. Simon Graduate School of Business Administration at the University of Rochester, to serve as an expert witness in these cases. Smith computed the present values of the LIBOR notes that were issued to Saba and Otrabanda

in connection with the sales of the Chase PPNs and IBJ CDs.  In particular, Smith determined that, as of March 23, 1990, the present values of the Fuji and Norinchukin LIBOR notes issued to Saba were $18,728,061 and $18,760,828, respectively.  Smith further determined that, as of July 27, 1990, the present values of the Sumitomo LIBOR notes issued to Otrabanda were $18,909,546.  Smith's valuations of the LIBOR notes were lower than those determined by Pepe.  See supra pp. 33-34, 63-64.

Relying on his lower valuations of the LIBOR notes, Smith concluded that Saba incurred transaction costs of $2,605,495 on the sale of the Chase PPNs, and that Otrabanda incurred transaction costs of $1,292,017 on the sale of the IBJ CDs. Smith opined that these transaction costs included fees to Merrill Lynch for locating the issuers of the PPNs and CDs and the LIBOR notes, a spread between the bid-ask price on the sale of the PPNs and CDs, and a spread on the bid-ask price on the purchase of the LIBOR notes.  Considering the volatile nature of LIBOR notes, Smith concluded that the bid-ask spread included the cost that the issuers of the LIBOR notes would incur in obtaining interest rate swaps.

B.  Legal and Accounting Fees

Brunswick paid the Mayer, Brown & Platt law firm for services related to Saba and Otrabanda as follows:

| Year | Amount |
|------|--------|
| 1990 | $288,736.75 |
| 1991 | 72,533.90 |
| 1992 | 15,092.64 |
| 1993 | 6,027.50 |

Brunswick paid total fees of $26,000 to Arthur Andersen for services related to Saba and Otrabanda.

C. **Total Expenses**

As of October 3, 1990, Brunswick had established a reserve for expenses attributable to Saba and Otrabanda of $10,600,000 as part of Brunswick's Accrued Disposition Costs account. Brunswick established the Accrued Disposition Costs account to accrue expenses that would be netted against the gains that Brunswick expected to realize on the sale of its Technical businesses and Nireco stock.

Arthur Andersen served as Brunswick's independent accountant from 1980 through 1993. In an interoffice memorandum dated October 16, 1990, authored by Michael P. Abrahamson (Abrahamson) and circulated to Arthur Andersen representatives in New York and Chicago, Abrahamson discussed Brunswick's accounting for its investment in Saba. The memorandum states that the accounting treatment for the transaction had been discussed with Arthur Andersen prior to Brunswick's recording the transaction. The memorandum further states in pertinent part:

> Any transaction costs (i.e., formation of the
> partnership) to be borne by Brunswick were charged
> against a gain on sale (i.e., below the line) recorded
> by Brunswick in connection with the disposition of

certain technical segment businesses.  These costs were charged against the gain because the only reason Brunswick formed the partnership was to maximize the after tax earnings and cash flow from these dispositions.

Although the second sentence quoted above is crossed out in the copy of the Abrahamson memorandum provided to the Court, the word "STET" appears in the margin next to the sentence in question.

Arthur Andersen also prepared a schedule, set forth below, itemizing Brunswick's accrual of $10,370,000 in foreign partnership expenses for the quarter ended December 31, 1990:

| Fees (in thousands) | Saba | Otrabanda | Total |
|---|---|---|---|
| Merrill Lynch | 1,750 | 1,425 | 3,175 |
| ABN (advisory fee)(actual $645) | 750 | | 750 |
| Bartolo-2nd FP | | 900 | 900 |
| Cravath, Swaine & Moore | 250 | 250 | 500 |
| N.V. Fides (Trust Co.) | 50 | 50 | 100 |
| Other | 300 | | 300 |
| Total Fees | 3,100 | 2,625 | 5,725 |

Financing Costs

| Underwriting Costs | | | |
|---|---|---|---|
| Chase Note and 3 CNs | 2,840 | 1,450 | 4,290 |
| Swap and Other | 355 | | 355 |
| Total | 6,295 | 4,075 | 10,370 |
| | | | Say 10.6 |

| | Paid in 1990 | Accrued at 12-31 | TOTAL | TOTAL EST.EXP. | DIF |
|---|---|---|---|---|---|
| Merrill Lynch | 1,436 | 1,750 | 3,186 | 3,175 | 11 |

Relying on a schedule prepared by Brunswick's accounting department on February 4, 1991, Arthur Andersen estimated that,

for the period ending December 31, 1990, Brunswick had incurred expenses of $3,667,000 relating to the sales of Brunswick's Technical businesses and Nireco stock.  The $3,667,000 in expenses were allocated as follows:

| Company | Amount |
|---------|--------|
| Vapor | $562,000 |
| Vapor A/C | 64,000 |
| TXT | 585,000 |
| ECS | 367,000 |
| Circle Seal | 516,000 |
| Biotech | 59,000 |
| NIRECO | 1,514,000 |
| Total | 3,667,000 |

On October 31, 1991, Brunswick's accountants reallocated $2,425,000 from a total reserve of $10,600,000 for partnership expenses and accounted for the $2,425,000 as commissions paid to Merrill Lynch in connection with the sales of Vapor, TXT, and Nireco stock.  Brunswick reallocated $1,250,000 to Vapor AC, $500,000 to TXT, and $675,000 to Nireco.  Brunswick never informed Arthur Andersen about the reallocation of expenses.

Based upon Arthur Andersen's work papers, Brunswick incurred net partnership expenses of $8,950,000.  Accounting for the reallocation of $2,425,000 of expenses described above, Brunswick concluded that it incurred net partnership expenses of $6,006,944.

XI.  Interest Rate Forecasts

Smith, petitioner's expert, prepared a report in which he employed various methods for forecasting interest rates in an

effort to determine the potential profitability of an investment in the LIBOR notes at issue. Relying on a market-based forecast for 3-month LIBOR as of February 23, 1990 and June 20, 1990, Smith opined that the LIBOR notes had the potential to provide returns up to $10,826,000 over their 5-year terms. Relying on the "symmetric" theory of interest rate behavior--the theory that a 525 basis point increase in interest rates was as equally probable as the actual 525 basis point decrease in interest rates that occurred during the period in question--Smith opined that the LIBOR notes had the potential to provide returns of up to $40,487,000. Relying on the "equal probability" theory of interest rate behavior--the theory that the likelihood of interest rates falling by one-half is equal to that of interest rates doubling over the same period--Smith opined that the LIBOR notes had the potential to provide returns of up to $80,683,000 over their 5-year terms.

Respondent retained Richard W. Leftwich (Leftwich), Professor of Accounting and Finance at the University of Chicago Graduate School of Business, to serve as an expert witness in these cases. Leftwich believed that Smith's market-based forecast for 3-month LIBOR was too high based on prevailing market rates and forecasts. Leftwich further opined that, in assessing the market's forecast of future interest rates, Smith improperly ignored the impact of the so-called liquidity and risk premium

hypotheses on the shape of the yield curve. Respondent presented evidence that market prognosticators were anticipating declining interest rates as of February 23, 1990. Specifically, the March 10, 1990, edition of Blue Chip Economic Indicators, a monthly publication containing a survey of the Wall Street community and economists, reported that the "consensus" view was that Treasury bill rates would decline from 7.7 percent in the first quarter of 1990 to 7.4 percent in the fourth quarter of 1990 and to 7.3 percent in the fourth quarter of 1991. Treasury bills are short-term debt instruments that correlate with 3-month LIBOR. The Blue Chip Economic Indicators survey remained fairly constant throughout the summer of 1990. However, the August 10, 1990, edition reported that the "consensus" view was that Treasury bill rates would fall to 7.2 percent in the fourth quarter of 1990 and remained virtually unchanged through the fourth quarter of 1991.

Contrary to Smith's forecast, interest rates fell dramatically between February 1990 and September 1992. Specifically, 3-month LIBOR rates declined from 8.375 percent in February 1990 to 3.125 percent in September 1992. If the partnerships had held the LIBOR notes for their full 5-year terms, the partnerships would have lost $19,716,000.

XII. Brunswick's Tax Returns and Related Documents

Brunswick filed a Form 1120 (U.S. Corporation Income Tax Return) for 1990 reporting (on a consolidated basis) a net short-

term capital loss of $142,953,624. The $142,953,624 net loss, reported on Schedule D, included gains and losses not specified on Schedule D or on any related schedules. The $142,953,624 figure included $162,886,086 in capital losses attributable to the sale of the LIBOR notes distributed to Brunswick by Saba and Otrabanda. The $162,886,086 figure represents the sum of $97,011,580 (the loss that Brunswick purportedly incurred on the sale of the 2 Fuji LIBOR notes and the Norinchukin LIBOR note) and $65,874,506 (the loss that Brunswick purportedly incurred on the sale of the 4 Sumitomo LIBOR notes). The $142,953,624 net loss also included capital gains of $12,033,334 (attributable to Brunswick's distributive share of the gain purportedly realized on the sale of the Chase PPNs) and $5,700,000 (attributable to Brunswick's distributive share of the gain purportedly realized on the sale of the IBJ CDs).

Brunswick applied $115,202,991 of the $142,953,624 net short-term capital loss to offset net long-term capital gains reported on its 1990 tax return.[2] Brunswick carried back $27,588,222 and $162,411 of the claimed 1990 capital losses to 1988 and 1987, respectively.

---

[2] The parties stipulated that Brunswick applied $116,135,453 of the $142,953,624 net short-term capital loss to offset capital gains reported on its 1990 tax return. We have relied on Brunswick's Form 1139 (Corporation Application for Tentative Refund), filed August 30, 1991, in finding that Brunswick actually applied $115,202,991 of the $142,953,624 to offset capital gains reported in 1990.

Brunswick filed a Form 1120 for 1991 reporting (on a consolidated basis) a long-term capital loss of $32,631,287 attributable to SBC's sale of the remaining Norinchukin LIBOR note. Brunswick used $846,745 of its claimed 1991 capital losses in 1991 and carried back $16,580,600 and $6,362,009 of the loss to 1989 and 1988, respectively. Brunswick carried forward $8,841,933 of its claimed 1991 capital losses.

Brunswick provided reserves for 100 percent of the tax attributable to its reported net capital losses from the Saba and Otrabanda transactions in its deferred tax account.

XIII.  Respondent's Determinations

A.  Saba FPAA

On December 30, 1996, respondent issued an FPAA to Saba. Respondent determined:  (1) The transactions financing the purchase and sale of the Chase PPNs would not be recognized for Federal income tax purposes for lack of economic substance; (2) Saba would not be recognized as a partnership; (3) partnership items would be reallocated to Brunswick (95 percent) and Skokie (5 percent); and (4) the basis of the 3 LIBOR notes distributed to Brunswick was $26,601,451 and the basis of the remaining LIBOR note transferred to SBC was $7,032,954.  In addition, respondent disallowed certain deductions.  First, respondent disallowed $25,000 of a $56,050 deduction that Saba had reported for amounts paid to N.V. Fides during the taxable year ended March 31, 1991.

The $25,000 item was labeled "incorporation fee". In addition, respondent disallowed a deduction of $120,266 that Saba had reported for amounts paid to Cravath, Swaine & Moore during the taxable year ended March 31, 1991, as well as the amortization of $1,500 and $8,500 attributable to amounts paid to Cravath, Swaine & Moore for the taxable years ended March 31, 1991 and June 21, 1992, respectively. Respondent determined that the disallowed amounts had not been substantiated and that petitioner had failed to demonstrate that the amounts represented ordinary and necessary business expenses.

Respondent made several alternative determinations in the event the Court were to recognize Saba as a partnership for Federal income tax purposes. Respondent determined in pertinent part: (1) No gain or loss would be recognized on the purchase and sale of the Chase PPNs because the transactions lacked economic substance; and (2) Saba's bases in the LIBOR notes distributed to Brunswick and SBC were $26,601,451 and $7,032,954, respectively.

B. Otrabanda FPAA

On December 30, 1996, respondent issued an FPAA to Otrabanda. Respondent determined: (1) The transactions financing the purchase and sale of the IBJ CDs would not be recognized for Federal income tax purposes for lack of economic substance; (2) Otrabanda would not be recognized as a

partnership; (3) partnership items would be reallocated to Brunswick (90 percent) and Skokie (10 percent); and (4) Brunswick's basis in the 4 LIBOR notes was $17,458,827. In addition, respondent disallowed certain deductions. First, respondent disallowed $25,000 of a $50,823 deduction that Otrabanda had reported for amounts paid to N.V. Fides during the taxable year ended June 21, 1991. The $25,000 item was labeled "incorporation fee". In addition, respondent disallowed a deduction of $72,996 that Otrabanda had reported for amounts paid to Cravath, Swaine & Moore during the taxable year ended June 21, 1991. Respondent determined that the disallowed amounts had not been substantiated and that petitioner had failed to demonstrate that the amounts represented ordinary and necessary business expenses.

Respondent made several alternative determinations in the event the Court were to recognize Otrabanda as a partnership for Federal income tax purposes. Respondent determined in pertinent part: (1) No gain or loss would be recognized on the purchase and sale of the IBJ CDs because the transactions lacked economic substance; and (2) Otrabanda's basis in the LIBOR notes distributed to Brunswick was $17,458,827.

## OPINION

The central issue in these cases is whether the partnerships' CINS transactions should be disregarded for Federal

income tax purposes for lack of economic substance.  Petitioner

bears the burden of proof.  See Rule 142(a); Brown v.

Commissioner, 85 T.C. 968, 998 (1985), affd. sub nom. Sochin v.

Commissioner, 843 F.2d 351 (9th Cir. 1988).

As discussed in detail below, we shall sustain respondent's

adjustments on the ground that the disputed CINS transactions

lack economic substance.  See ACM Partnership v. Commissioner,

157 F.3d 231 (3d Cir. 1998), affg. in part and revg. in part T.C.

Memo. 1997-115, where the Court of Appeals for the Third Circuit

affirmed this Court's holding that virtually identical CINS

transactions arranged by Merrill Lynch lacked economic substance.

Based upon our holding in these cases, we need not decide whether

Saba and Otrabanda were valid partnerships.  Cf. ASA Investerings

Partnership v. Commissioner, T.C. Memo. 1998-305, on appeal to

the Court of Appeals for the District of Columbia Circuit.

I.  Evidentiary Matters

Prior to trial, petitioner asserted that certain documents

in its possession, including the Zelisko memorandum, were

privileged and not subject to discovery.  After respondent moved

to compel production of the documents, the Court ordered

petitioner to submit the documents to the Court for in camera

review.  On August 14, 1998, the Court issued an order holding,

among other things, that only limited portions of the Zelisko

memorandum were privileged and directing petitioner to produce the document with appropriate redactions. Petitioner complied with the Court's order.

In its reply brief, petitioner states that "Exhibit 408-J [the Zelisko memorandum] is protected by attorney-client privilege and the work-product doctrine. Petitioners renew their claim of attorney-client privilege and application of the work-product doctrine with respect to Exhibit 408-J."

A. Attorney-Client Privilege

Our rules provide for discovery of information that is not privileged but relevant to the subject matter involved in the pending case. See Rule 70(b). The party opposing discovery bears the burden of establishing that the information sought is privileged. See Zaentz v. Commissioner, 73 T.C. 469, 475 (1979); Branerton Corp. v. Commissioner, 64 T.C. 191, 193 (1975).

Section 7453 provides that the Court is bound by the rules of evidence applicable in trials without a jury in the U.S. District Court for the District of Columbia. See Rule 143(a). The Court of Appeals for the District of Columbia "adheres to the axiom that the attorney-client privilege must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'" Linde Thomson Langworthy Kohn & Van Dyke v. Resolution Trust Corp., 5 F.3d 1508, 1514 (D.C. Cir.

1993)(quoting <u>In re Sealed Case</u>, 676 F.2d 793, 807 n.44 (D.C. Cir. 1982)); see <u>Mead Data Cent. Inc. v. U.S. Dept. of Air Force</u>, 566 F.2d 242 (D.C. Cir. 1977).

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 389 (1981); <u>Hartz Mountain Indus. v. Commissioner</u>, 93 T.C. 521, 524-525 (1989). The attorney-client privilege "applies to communications made in confidence by a client to an attorney for the purpose of obtaining legal advice, and also to confidential communications made by the attorney to the client if such communications contain legal advice or reveal confidential information on which the client seeks advice." <u>Hartz Mountain Indus. v. Commissioner</u>, <u>supra</u> at 525, (citing <u>Upjohn Co. v. United States</u>, <u>supra</u>). However, "the privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." <u>Upjohn Co. v. United States</u>, <u>supra</u> at 395.

Except for the matters that were redacted, the Zelisko memorandum, set forth in its redacted form <u>supra</u> pp. 15-18, does not contain privileged communications. The memorandum is self-described as "a bullet point summary of a transaction proposed by Merrill Lynch to Brunswick Corporation (BC) on December 8, 1989 to generate sufficient capital losses to offset the capital gain

which will be generated on the sale of the Nireco shares."  The portion of the Zelisko memorandum that we ordered to be disclosed does not contain communications from Brunswick to its attorney, or legal advice or analysis, but is merely a factual account of a meeting between a third party, Merrill Lynch, and Brunswick's tax counsel.  See United States v. Ackert, 169 F.3d 136, 139-140 (2d Cir. 1999); see also  Mead Data Cent. Inc. v. U.S. Dept. of Air Force, supra at 254-255.

B.  Work-Product Doctrine

It is well settled that our Rules generally protect attorney work-product from discovery.  See Note to Rule 70, 60 T.C. 1097, 1098; see also Hartz Mountain Indus. v. Commissioner, supra at 528; Zaentz v. Commissioner, supra at 478; Branerton Corp. v. Commissioner, supra at 198; P.T. & L. Constr. Co. v. Commissioner, 63 T.C. 404, 408 (1974).  The policies and concerns underlying the attorney work product-doctrine are explained in Hickman v. Taylor, 329 U.S. 495, 510-511 (1947), as follows:

> In performing his various duties * * * it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.  * * *  This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways--aptly though roughly termed * * * the "work product of the lawyer."  Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten.  An attorney's

thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial.  The effect on the legal profession would be demoralizing.  And the interests of the clients and the cause of justice would be poorly served.

The attorney work-product doctrine generally protects materials prepared in anticipation of litigation.  See In re Sealed Case, 146 F.3d 881, 885-887 (D.C. Cir. 1998); Branerton Corp. v. Commissioner, supra at 198; P.T. & L. Constr. Co. v. Commissioner, supra at 408.

Where an attorney has prepared a document in anticipation of litigation, the document will be protected from discovery only to the extent that it contains opinions, judgments, and thought processes of counsel as opposed to purely factual materials.  See In re Sealed Case, supra at 888.  We recognize that the Zelisko memorandum may have been prepared in part in anticipation of litigation.  In this regard, we permitted Brunswick to redact portions of the document deemed to be privileged.  However, the portion of the Zelisko memorandum that we ordered to be disclosed does not qualify for protection from disclosure under the attorney work-product doctrine inasmuch as it consists of a factual account of a meeting between Zelisko and representatives of Merrill Lynch and is bereft of material that could be characterized as Zelisko's legal opinion or judgment.

II.  Contingent Installment Sale Provisions

Section 453(a) provides the general rule that income from an installment sale shall be taken into account for purposes of title 26 under the installment method of accounting.  Section 453(b)(1) defines the term "installment sale" as a disposition of property where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs.  Section 453(k)(2) provides that subsection (a) shall not apply to an installment obligation arising out of a sale of stock or securities which are traded on an established securities market or, to the extent provided in regulations, property (other than stock or securities) of a kind regularly traded on an established market.

Section 453(j)(2) provides that the Secretary shall prescribe regulations providing for ratable basis recovery in transactions where the gross profit or the total contract price or both cannot be readily ascertained.  Pursuant to this authority, the Secretary promulgated the ratable basis recovery rules under section 15A.453-1(c)(3)(i), Temporary Income Tax Regs., 46 Fed. Reg. 10711 (Feb. 4, 1981), which provides in pertinent part:

> When a stated maximum selling price cannot be
> determined as of the close of the taxable year in which
> the sale or other disposition occurs, but the maximum
> period over which payments may be received under the
> contingent sale price agreement is fixed, the
> taxpayer's basis (inclusive of selling expenses) shall

be allocated to the taxable years in which payment may be received under the agreement in equal annual increments.  * * *  If in any taxable year no payment is received or the amount of payment received (exclusive of interest) is less than the basis allocated to that taxable year, no loss shall be allowed unless the taxable year is the final payment year under the agreement * * *.

In short, section 15A.453-1(c)(3)(i), Temporary Income Tax Regs., supra, provides that, in the case of an installment sale in which the maximum selling price cannot be determined, but the period over which payments are to be received is fixed, the taxpayer's basis shall be allocated equally over the taxable years in which payments may be received under the installment sale agreement.

Depending upon the particular terms of an otherwise valid installment sale, the ratable basis recovery rules may have the effect of accelerating the recognition of income on a CINS transaction while deferring the recognition of losses.  See sec. 15A.453-1(c)(7), Temporary Income Tax Regs., 46 Fed. Reg. 10709 (Feb. 4, 1981).  However, the ratable basis recovery rules are not inflexible, as explained in the preamble to the regulation, T.D. 7768, which states in pertinent part:

Because the rules set forth in these regulations may not provide a schedule of basis recovery which is reasonable for every contingent transaction, these regulations provide that a taxpayer may use an alternative method of basis recovery where the rules in the regulations would substantially and inappropriately defer basis recovery.  These regulations also provide that when the general rules would substantially and inappropriately accelerate bases recovery, the Service may require a different method of basis recovery.

Read as a whole, the regulations impart an intention to establish a method of accounting that reasonably will match the gains and losses reported on a CINS transaction.

The partnerships sold the PPNs and CDs for cash and LIBOR notes and reported their gains on the sales by ratably allocating their bases pursuant to section 15A.453-1(c)(3)(i), Temporary Income Tax Regs., supra.  Based on their partners' respective capital accounts at the time of the sales, Saba and Otrabanda allocated 90 percent of the gains realized on the transactions to Sodbury and Bartolo, respectively.  However, because Sodbury and Bartolo were not subject to U.S. income tax, their distributive shares of the gains realized on the transactions escaped U.S. taxation.  On the other hand, Brunswick's more modest 10 percent distributive share of the gains on the sales of the PPNs and CDs were dwarfed by the substantial capital losses that Brunswick later realized following the distribution and sale of the LIBOR notes.

Petitioner contends that the disputed transactions satisfy the requirements of the contingent installment sale provisions and the ratable basis recovery rules.  In particular, the partnerships sold PPNs and CDs--assets that are not traded on an established securities market.  See sec. 453(k)(2)(A).  In exchange, the partnerships received cash and LIBOR notes. Petitioner contends that the LIBOR notes represent a series of

contingent payments made over a period of years as required under sections 453(b)(1) and 15A.453-1(c)(3)(i), Temporary Income Tax Regs., supra. Respondent contends that the LIBOR notes do not constitute qualifying contingent payments under section 453 on the ground that Merrill Lynch's swap arrangements created an "artificially supported market" for the LIBOR notes and effectively converted the LIBOR notes to "purchaser evidences of indebtedness payable on demand or readily tradable" within the meaning of sections 453(f)(4) and 15A.453-1(e), Temporary Income Tax Regs., supra. In light of our holding in these cases, we need not consider this point.

## III. Petitioner's Argument That An Economic Substance Analysis Is Not Warranted

### A. Gregory v. Helvering and Horn v. Commissioner

Relying primarily on Gregory v. Helvering, 293 U.S. 465, 469 (1935), and Horn v. Commissioner, 968 F.2d 1229, 1238 n.12 (D.C. Cir. 1992), revg. Fox v. Commissioner, T.C. Memo. 1988-570, petitioner contends that, rather than having to prove that the disputed CINS transactions were imbued with economic substance, petitioner is required to show only that the disputed transactions resulted in a contingent "sale" of the PPNs and CDs within the meaning of sections 1001(a) and 453(a).

It is well settled that taxpayers generally are free to structure their business transactions as they please, even if motivated by tax avoidance considerations. See Gregory v.

Helvering, supra at 469; Rice's Toyota World, Inc. v.
Commissioner, 81 T.C. 184, 196 (1983), affd. in part, revd. in
part and remanded 752 F.2d 89 (4th Cir. 1985).  Nonetheless, to
be accorded recognition for tax purposes, a transaction generally
is expected to have "economic substance which is compelled or
encouraged by business or regulatory realities, is imbued with
tax-independent considerations, and is not shaped solely by tax-
avoidance features that have meaningless labels attached."  Frank
Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978).  This
last principle, which finds its origin in Gregory v. Helvering,
supra, is better known as the economic substance doctrine.

In Gregory v. Helvering, supra, the taxpayer was the sole
shareholder of United Mortgage Corporation (United) which held
1,000 shares of Monitor Securities Corporation (Monitor).  The
taxpayer intended to obtain the Monitor shares and sell them for
a profit.  However, the taxpayer hoped to structure the transfer
of the shares from United to herself so as to reduce or avoid the
income tax that would arise if the transfer were treated as a
dividend distribution.  In this regard, the taxpayer ostensibly
arranged a "reorganization" pursuant to section 112(g) of the
Revenue Act of 1928, ch. 852, 45 Stat. 791, 818.  Specifically,
the taxpayer organized a third corporation, Averill Corporation
(Averill), had United transfer its Monitor shares to Averill, and

then dissolved Averill.  The taxpayer ultimately received the Monitor shares from Averill in a liquidating distribution.

Upon review of the matter, the Supreme Court sustained the Commissioner's determination that the purported reorganization was a sham.  The Supreme Court concluded that the transaction was carried out in contravention of the plain intent of the controlling statute, reasoning in pertinent part as follows:

> Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose--a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner.  No doubt, a new and valid corporation was created.  But that corporation was nothing more than a contrivance to the end last described.  It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. [Gregory v. Helvering, supra at 469.]

In sum, Gregory v. Helvering, supra, stands for the principle that, although a business transaction may be structured in strict compliance with all pertinent statutory requirements, a court charged with reviewing the transaction is not obliged to

respect its form for tax purposes where the record shows that the transaction was in fact a contrivance designed to obtain a tax benefit not intended by Congress under the taxing statute.

The Court of Appeals for the District of Columbia Circuit has considered the scope and application of the economic substance doctrine. In Horn v. Commissioner, supra, the Commissioner disallowed losses claimed by commodities dealers with respect to so-called option-straddle transactions on the ground that the transactions were economic shams. This Court granted the Commissioner's motion for summary judgment, sustaining the Commissioner's determination that the transactions were devoid of economic substance. See Fox v. Commissioner, supra.

On appeal, the Court of Appeals for the District of Columbia Circuit reversed after concluding that Congress had intended to allow the disputed losses pursuant to section 108 of the Tax Reform Act of 1984 (Division A of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630), as amended under the Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, sec. 1808(d), 100 Stat. 2817. For the text of section 108, and the 1986 amendment, see Glass v. Commissioner, 87 T.C. 1087, 1164-1166 (1986). After reviewing Supreme Court precedent and scholarly articles on the subject, the Court of Appeals described the sham transaction doctrine as follows:

first, the sham transaction doctrine is simply an aid
to identifying tax-motivated transactions that Congress
did not intend to include within the scope of a given
benefit-granting statute; and second, a transaction
will not be considered a sham if it is undertaken for
profit or for other legitimate nontax business
purposes. * * * As the Seventh Circuit pointed out in
Yosha,[861 F.2d at 498,] "the taxpayer [in Gregory] was
trying to take advantage of a loophole inadvertently
created by the framers of the tax code; in closing such
loopholes the courts could not rightly be accused of
having disregarded congressional intent or
overreached." * * *  [Horn v. Commissioner, 968 F.2d at
1238.]

Relying on section 108(a) and (b) as amended under TRA 1986,

the Court of Appeals stated that "Congress undoubtedly has the

power to grant beneficial tax treatment to economically

meaningless behavior, if indeed that is what happened here."

Horn v. Commissioner, 968 F.2d at 1234.  Pointing to the plain

language of section 108, the Court of Appeals held that Congress

had authorized deductions for losses associated with option-

straddle transactions so long as the taxpayer qualified as a

commodities dealer.  See Horn v. Commissioner, supra at 1239.

The Court of Appeals stated that "section 108(b) does all that it

need do for the taxpayers to prevail here--it creates an

irrebuttable presumption that a commodities dealer has made his

straddle trades in a trade or business, i.e., he has not engaged

in an economic sham."  Id. at 1239.  The Court of Appeals further

noted that section 108(a) closely tracked the sham transaction

doctrine insofar as a loss was allowed only if the transaction

was entered into for profit or in a trade or business.  See id.

Concluding that it was inappropriate to apply the sham transaction doctrine to section 108, the Court of Appeals reasoned as follows:

> The sham transaction doctrine is an important judicial device for preventing the misuse of the tax code; but the doctrine cannot be used to preempt congressional intent. As Government counsel properly conceded at oral argument, Congress has the power to authorize these transactions, whether or not they are economic shams. And the language of section 108(a)--providing that the deduction shall be allowed if the transaction was in a trade or business <u>or</u> engaged in for profit-- coupled with the irrebuttable presumption of section 108(b) [that every straddle loss incurred by a commodities dealer shall be treated as a loss incurred in a trade or business], makes it clear that that is exactly what Congress intended to do. [<u>Horn v. Commissioner</u>, 968 F.2d at 1236.]

Citing <u>Gregory v. Helvering</u>, 293 U.S. 465 (1935), and <u>Horn v. Commissioner</u>, <u>supra</u>, petitioner contends that "Application of the 'economic substance' doctrine must therefore begin with the Code, and <u>the lack of a business purpose and the absence of a prospect of profit are irrelevant unless the underlying Code provisions require the presence of those elements</u>". (Emphasis added.) Petitioner misconstrues both cases.

As previously discussed, <u>Gregory v. Helvering</u>, <u>supra</u>, stands for the principle that a court is not obliged to respect the form of a transaction for tax purposes where the record shows that the transaction was in fact a contrivance designed to obtain an unintended tax benefit. Although the Supreme Court made it clear that a transaction cannot be disregarded solely because it was

driven by a tax motive, the Supreme Court held that the reorganization in question was a sham in large part because the transaction had no business or corporate purpose. See Gregory v. Helvering, supra at 469. The Supreme Court's reliance on the lack of a business or corporate purpose for the transaction is notable in that the corporate reorganization provision in question did not explicitly require a business purpose--the Supreme Court concluded that a business or corporate purpose was implied in the provision. See id. at 469; see also Yosha v. Commissioner, 861 F.2d 494, 499 (7th Cir. 1988) (quoting Commissioner v. Transport Trading & Terminal Corp., 176 F.2d 570, 572 (2d Cir. 1949)).

Nor does Horn v. Commissioner, supra, support petitioner's position that the economic substance doctrine is only relevant where the controlling statutory provision by its terms requires a business purpose and a reasonable prospect of a profit. Although the Court of Appeals in Horn v. Commissioner, supra, concluded that it would be premature to proceed with an economic substance analysis without first examining the controlling statutory provision and its legislative history, the relevant inquiry is not whether business purpose or the prospect of a profit are required elements under the controlling provision, but rather whether Congress enacted the provision with the intention of sanctioning a particular transaction regardless of its economic

substance.  See <u>Knetsch v. United States</u>, 364 U.S. 361, 369 (1960), where the Supreme Court sustained the Commissioner's disallowance of interest deductions on the ground that "nothing in the Senate Finance and House Ways and Means Committee Reports on section 264 * * * [suggests] that Congress in exempting pre-1954 annuities intended to protect sham transactions."

Consistent with the foregoing, an analysis of the economic substance of the CINS transactions is appropriate in the absence of an indication in the controlling statutory provisions that Congress intended to favor such transactions regardless of their economic substance.

B.  <u>Section 1001 and Cottage Savings</u>

Petitioner further contends that an analysis of the economic substance of the disputed CINS transactions is unwarranted under section 1001(a) and the Supreme Court's interpretation of that provision in <u>Cottage Sav. Association v. Commissioner</u>, 499 U.S. 554 (1991).  Specifically, petitioner maintains that section 1001(a) and <u>Cottage Savings</u> demonstrate that the gain or loss realized on a sale or exchange of property shall be recognized for tax purposes regardless of the business purpose or potential for profit underlying the transaction.

Section 1001(a) provides that gain or loss from a sale or other disposition of property is determined by the difference between the amount realized from the sale and its adjusted basis.

Section 1001(b) defines the "amount realized" as "the sum of any money received plus the fair market value of the property (other than money) received."  Section 1001(c) provides: "Except as otherwise provided in this subtitle, the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized."

According to petitioner, section 1001(c) and section 1.1002-1(b), Income Tax Regs., which provides that exceptions to the general rule of section 1001(c) must be "strictly construed and do not extend either beyond the words or the underlying assumptions and purposes of the exception", compel the Court to respect the tax consequences of a sale or exchange of property regardless of the economic substance of the transaction. Petitioner further asserts that the legislative history of section 1001 reflects Congress' clear intent to tax the gain or loss on all exchanges of property.  Petitioner cites the legislative history of section 203 of the Revenue Act of 1924, ch. 234, 43 Stat. 253, which states:

> It appears best to provide generally that gain or loss is recognized from all exchanges and then except specifically and in definite terms those cases of exchange in which it is not desired to tax the gain or allow the loss.  This results in definiteness and accuracy and enables a taxpayer to determine prior to the consummation of a given transaction

the tax liability that will result therefrom. [H. Rept. 179, 68th Cong., 1st Sess. (1924), 1939-1 C.B. (Part 2) 251; S. Rept. 398, 68th Cong., 1st Sess. (1924), 1939-1 C.B. (Part 2) 275.]

Unlike the statutory provision at issue in Horn v. Commissioner, 968 F.2d 1229 (D.C. Cir. 1992), neither the plain language of section 1001 nor its legislative history lends any support to the proposition that Congress intended to respect the tax consequences of sales or exchanges of property that lack economic substance.  While it is true that Congress crafted section 1001 as a provision that would be broadly applicable to sales or exchanges of property, subject to specific statutory exceptions, Congress did not proscribe an analysis of the economic substance of a sale or exchange of property.  Cf. Compaq Computer Corp. v. Commissioner, 113 T.C. 17 (1999) (Rejecting the taxpayer's argument that the foreign tax credit regime completely sets forth Congress' intent as to allowable foreign tax credits and that an additional economic substance requirement was not intended by Congress).  In this regard, it is important to recognize that the economic substance doctrine is not a judicially created exception to the general rule of section 1001(c), as petitioner implies, but rather is a "canon of statutory interpretation that statutes should not be read to create 'absurd results.'"  Horn v. Commissioner, supra at 1239.

Moreover, petitioner's position conflicts with long-standing Supreme Court precedent holding that the tax consequences of

sales or exchanges of property need not be respected where "the challenged tax event is * * * a sham", and that the Government may look at the realities of a transaction and "disregard the effect of the fiction as best serves the purposes of the tax statute."  Higgins v. Smith, 308 U.S. 473, 477 (1940).    In Higgins v. Smith, supra, the Supreme Court held that a taxpayer did not sustain a loss within the meaning of section 23(e) of the Internal Revenue Code of 1939 when he sold securities below cost to his wholly owned corporation.  Because the taxpayer retained dominion and control over the stock transferred through his ownership of the corporate transferee, the Court found that "no loss in the statutory sense could occur upon a sale by a taxpayer to * * * [a wholly owned corporation]", notwithstanding the fact that an actual transfer of the stock had occurred.  Id. at 476; see also Frank Lyon Co. v. United States, 435 U.S. 561 at 573 ("In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed."); Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945) ("To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.")

Petitioner's reliance on <u>Cottage Sav. Association v.</u>
<u>Commissioner</u>, 499 U.S. 554 (1991), likewise is misplaced.
Petitioner contends that the disputed CINS transactions must be
respected for tax purposes inasmuch as they were structured and
carried out in strict compliance with the requirements of
sections 1001 and 453.

In <u>Cottage Sav. Association v. Commissioner</u>, <u>supra</u>, the
taxpayer, a savings and loan association, owned participation
interests in mortgages that had declined in value due to a surge
in interest rates during the late 1970s.  After holding the
participation interests for a number of years, the taxpayer sold
them to several savings and loan associations and purchased from
them participation interests in mortgages of approximately equal
fair market value.  The taxpayer claimed a $2.4 million loss
deduction equal to the excess of its bases in the participation
interests that it sold over the fair market value of the
participation interests that it purchased.

The Commissioner disallowed the claimed loss on alternative
grounds:  (1) The taxpayer had not realized the losses within the
meaning of regulations promulgated under section 1001; and (2)
the transactions lacked economic substance.  However, the Supreme
Court sustained the taxpayer's loss deduction, holding that the
taxpayer had realized a loss pursuant to section 1001 because the
participation interests exchanged were "materially different"

embodying "legally distinct entitlements".  Id. at 566.  In
rejecting the Commissioner's determination that the losses should
be disallowed because they lacked economic substance, the Supreme
Court noted that the Commissioner's argument on the point had
consisted of one sentence in a footnote in his brief with a
citation to Higgins v. Smith, supra.  See Cottage Sav.
Association v. Commissioner, supra at 567-568.  Emphasizing that
the transfers in question were made at arm's length, the Supreme
Court concluded that the Commissioner's citation to Higgins v.
Smith, supra, without further elaboration, was insufficient to
deny the losses under section 165(a).  Cottage Sav. Association
v. Commissioner, supra at 568.

We reject petitioner's contention that we are obliged to
respect the tax consequences of the CINS transactions at issue in
these cases under Cottage Sav..  In rejecting the Commissioner's
economic substance argument in Cottage Sav., the Supreme Court
held that the Commissioner had failed to rebut evidence that the
transaction was conducted at arm's length.  See Lerman v.
Commissioner, 939 F.2d 44, 55-56 n.14 (3d Cir. 1991), affg. Fox
v. Commissioner, T.C. Memo. 1988-570.  The Supreme Court did not
apply the economic substance test as fully articulated in cases
such as Frank Lyon Co. v. United States, 435 U.S. at 583-584, and
Horn v. Commissioner, 968 F.2d at 1237.  Accordingly, Cottage
Sav. Association v. Commissioner, supra, "cannot be read for the

proposition that, as long as a transaction is bona fide, i.e.,
actually occurred, it cannot be denied economic substance."
Lerman v. Commissioner, supra at 55-56 n.14.

In any case, the transaction disputed in Cottage Sav.
Association v. Commissioner, supra, is fundamentally different
from the transactions disputed in the cases before the Court.
The taxpayer in Cottage Sav. Association v. Commissioner, supra,
sought to minimize its taxes by closing out a real economic loss,
whereas the disputed CINS transactions were designed to generate
fictional losses to offset Brunswick's capital gains.  See Compaq
Computer Corp. v. Commissioner, 113 T.C. 17 (1999).

In ACM Partnership v. Commissioner, 157 F.3d 231 (3d Cir.
1998), affg. in part and revg. in part T.C. Memo. 1997-115, the
Court of Appeals for the Third Circuit affirmed this Court's
holding that a CINS transaction that Merrill Lynch had arranged
for Colgate-Palmolive Company lacked economic substance.  We
agree with the Court of Appeals' reasoning in that case,
distinguishing Cottage Sav. Association v. Commissioner, supra,
in pertinent part as follows:

> The distinctions between the exchange at issue in
> this case and the exchange before the Court in Cottage
> Savings predominate over any superficial similarities
> between the two transactions.  The taxpayer in Cottage
> Savings had an economically substantive investment in
> assets which it had acquired a number of years earlier
> in the course of its ordinary business operations and
> which had declined in actual economic value by over $2
> million from approximately $6.9 million to
> approximately $4.5 million from the time of acquisition

to the time of disposition. See Cottage Sav., 499 U.S. at 557-58, 111 S.Ct. at 1506. The taxpayer's relinquishment of assets so altered in actual economic value over the course of a long-term investment stands in stark contrast to ACM's relinquishment of assets that it had acquired 24 days earlier under circumstances which assured that their principal value would remain constant and that their interest payments would not vary materially from those generated by ACM's cash deposits. [ACM Partnership v. Commissioner, supra at 251; fn. ref. omitted.]

In accord with the preceding discussion, we conclude that Cottage Sav. Association v. Commissioner, supra, neither mandates that we respect the tax consequences of the CINS transactions disputed in these cases, nor precludes a review of the economic substance of those transactions. Moreover, based upon our review of sections 1001 and 453, and their underlying regulations and legislative histories, we are satisfied that Congress did not intend to create the loophole that the partnerships have attempted to exploit. See Horn v. Commissioner, 968 F.2d at 1238. Consequently, we will proceed with an analysis of the economic substance of the CINS transactions.

IV. Petitioner's Contention That CINS Transactions Are Imbued With Economic Substance

Petitioner contends that respondent's partnership adjustments must be rejected even assuming that the economic substance doctrine, as articulated in ACM Partnership v. Commissioner, supra, is applicable.

An evaluation of the economic substance of the CINS transactions requires: (1) A subjective inquiry whether the

partnerships carried out the transactions for a valid business purpose other than to obtain tax benefits; and (2) an objective inquiry whether the CINS transactions had practical economic effects other than the creation of tax benefits.  See ACM Partnership v. Commissioner, supra at 247-248; Horn v. Commissioner, 968 F.2d at 1237; Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. in part, revg. and remanding in part Larsen v. Commissioner, 89 T.C. 1229 (1987), and affg. Memorandum Opinions of this Court; Rose v. Commissioner, 868 F.2d 851, 853-854 (6th Cir. 1989), affg. 88 T.C. 386 (1987).

A transaction imbued with economic substance normally will be recognized for tax purposes even in the absence of a nontax business purpose.  See Northern Ind. Pub. Serv. Co. v. Commissioner, 115 F.3d 506, 512 (7th Cir. 1997), affg. 105 T.C. 341 (1995); Larsen v. Commissioner, supra at 1253.  The Court of Appeals for the District of Columbia Circuit has held that "a transaction undertaken for a nontax business purpose will not be considered an economic sham even if there was no objectively reasonable possibility that the transaction would produce profits."  Horn v. Commissioner, 968 F.2d at 1237.  But cf. Kirchman v. Commissioner, 862 F.2d 1486, 1492 (11th Cir. 1989), (existence of a nontax business purpose does not mandate the

recognitition of a transaction that otherwise lacks economic substance) affg. <u>Glass v. Commissioner</u>, 87 T.C. 1087 (1986).

A. <u>Business Purpose</u>

Petitioner argues that the partnerships engaged in the CINS transaction to achieve a number of business objectives other than to obtain tax benefits.  Petitioner first contends that the partnerships provided an appropriate investment vehicle for the proceeds from the sale of Brunswick's Technical businesses and Nireco stock, at a time when Brunswick was vulnerable to a takeover attempt.  The partnerships purportedly were viewed in part as a means to "tie up" Brunswick's excess cash so that it could not be used against Brunswick in a leveraged buy out.  Petitioner further contends that the acquisition of LIBOR notes, with floating interest rates, provided a hedge against a decline in Brunswick's marine sales (and lower profits) associated with periods of rising interest rates.  Finally, petitioner maintains that the partnerships provided Brunswick with an opportunity to establish a relationship with a large, international financial institution consistent with Brunswick's long-term strategic planning.

Despite petitioner's assertions to the contrary, there is overwhelming evidence in the record that Saba and Otrabanda were organized solely to generate tax benefits for Brunswick. Although petitioner has attempted to downplay the significance of the document, the Zelisko memorandum is direct and compelling evidence that Brunswick intended to use the partnerships as a device to generate capital losses to offset the capital gains that Brunswick anticipated on the sales of its Technical businesses and Nireco stock. The Zelisko memorandum, prepared shortly after Ms. Zelisko's meeting with Merrill Lynch representatives and well in advance of the formation of the partnerships, describes in precise detail the steps that would be required for the CINS transactions to generate substantial capital losses for Brunswick's benefit. Each of the partnerships subsequently fulfilled all of the steps outlined in the Zelisko memorandum.

Equally compelling is the "FOREIGN PARTNERSHIP TAX UPDATE" that McManaman prepared on April 20, 1990, in which he projected that Brunswick would realize capital losses of $80 million and $57 million from its participation in Saba and Otrabanda, respectively. Significantly, McManaman's projections generally

were consistent with those set forth in the Zelisko memorandum and were made 2 months before the Otrabanda partnership was formed.  McManaman's projections were also made well before O'Brien purportedly formed the view that interest rates would fall.  On April 25, 1990, McManaman's projections were presented to Brunswick's Board of Directors.

The record also shows that ABN and the other financial institutions involved in the CINS transactions fully understood Brunswick's intentions.  The assumptions underlying the Zelisko memorandum and McManaman's projections are echoed in a number of ABN documents describing the partnerships.  In addition, internal memoranda maintained by Fuji and Norinchukin stated that the transactions were designed to provide tax savings for Merrill Lynch's customers.  Finally, an internal Arthur Andersen memorandum stated that "the only reason Brunswick formed the partnership was to maximize the after tax earnings and cash flow" from the sale of its Technical businesses.

Against this backdrop, we conclude that each of the ostensible business purposes that petitioner cites as a tax-independent justification for Brunswick's participation in the partnerships is nothing more than a derivative or by-product of the CINS transactions.  Specifically, the partnerships' purchase of the PPNs and CDs was not driven by the desire to "tie-up" Brunswick's funds at a time when Brunswick was vulnerable to a

hostile takeover, but rather was driven by section 453(k)(2) which provides that the installment sale provisions do not apply to sales of stock, securities, or certain other property which is traded on an established market. In other words, as O'Brien admitted at trial, the partnerships attempted to comply with section 453(k)(2) by initially investing in the PPNs and CDs. We are not convinced on the record presented that Brunswick participated in these partnerships because it was particularly vulnerable to a hostile takeover attempt during the period in question or because the partnerships would "tie-up" Brunswick's funds. And even if Brunswick considered itself vulnerable, it had already taken far more meaningful and effective steps to counter any takeover attempt.

Similarly, the partnerships did not agree to receive LIBOR notes in partial payment for the PPNs and CDs in order to provide Brunswick with a hedge against its interest rate risk, but rather the partnerships accepted partial payment in the form of LIBOR notes in an effort to ensure that at least 1 payment would be received after the close of the taxable year in which the PPNs and CDs were sold as required by section 453(b)(1) and to ensure that the "total contract price" could not be readily ascertained as required under the ratable basis recovery rules prescribed in section 453(j)(2) and section 15A.453-1(c)(3)(i), Temporary Income Tax Regs., 46 Fed. Reg. 10711 (Feb. 4, 1981). The fact

that Brunswick entered into swaps partially to hedge its exposure to the LIBOR notes belies petitioner's assertion that the LIBOR notes were intended to hedge against a decline in boat sales (and lower profits) associated with periods of rising interest rates. Moreover, it can hardly be said that Brunswick's modest interest in the LIBOR notes provided a meaningful hedge against Brunswick's marine sales which totaled $2 billion in 1989.

Finally, Brunswick did not participate in the partnerships in order to establish a relationship with a large international financial institution. To the contrary, Brunswick entered into the partnerships with a foreign partner to ensure that the bulk of the partnerships' "gains" on the sales of the PPNs and CDs could be allocated to a foreign entity that would not be subject to U.S. income tax.

In closing on this point, we observe that the record contains little in the way of notes or documentation, such as corporate minutes or similar material, in which Brunswick's officers or directors discussed the business purposes that purportedly motivated Brunswick to participate in the partnerships. Considering the entire record in these cases, the self-serving testimony of Brunswick's officers involved in planning and implementing the CINS transactions is insufficient to convince us that the transactions were pursued for any nontax business purposes. We conclude that the proffered business

purposes amount to little more than window dressing for transactions that were designed and implemented solely to generate tax benefits for Brunswick.

B.  Economic Substance

As previously mentioned, a transaction imbued with economic substance normally will be recognized for tax purposes even in the absence of a nontax business purpose.  See Northern Ind. Pub. Serv. Co. v. Commissioner, 115 F.3d at 511-512; Larsen v. Commissioner, 89 T.C. at 1253.  In Knetsch v. United States, 364 U.S. 361, 366 (1960) (quoting Gilbert v. Commissioner, 248 F.2d 399, 411 (2d Cir. 1957) (J. Hand, dissenting), the Supreme Court held that the transaction in question was a sham because it did "not appreciably affect * * * [the taxpayer's] beneficial interest except to reduce his tax".  In Northern Ind. Pub. Serv. Co. v. Commissioner, supra at 512, the Court of Appeals for the Seventh Circuit held that the Commissioner could not set aside transactions which resulted "in actual, non-tax related changes in economic position."  See ACM Partnership v. Commissioner, 157 F.3d at 248; Jacobson v. Commissioner, 915 F.2d 832, 837 (2d Cir. 1990).  In Horn v. Commissioner, 968 F.2d at 1237, the Court of Appeals for the District of Columbia Circuit indicated that, before declaring a transaction an economic sham, the court should consider whether the transaction presented a reasonable prospect for economic gain.

Petitioner contends that the CINS transactions were imbued with economic substance inasmuch as the partnerships accepted the benefits and burdens of ownership of the PPNs and CDs, and later the LIBOR notes. Petitioner asserts that the partnerships assumed financial risks associated with the PPNs and CDs, including: (1) Credit risk--the risk that Chase or IBJ would not be able to make an interest or principal payment; (2) event risk--the risk that a single event or circumstance could preclude Chase or IBJ from repaying its obligations; (3) credit spread risk--the risk that general credit spreads in the market may rise or fall; and (4) liquidity risk--the risk that the owner of a debt instrument will not be able to convert the instrument into cash at or near its market value. Petitioner further contends that the economic substance of the CINS transactions is reflected in the interest (both paid and accrued) that Saba and Otrabanda earned on the PPNs and CDs, as well as the reduced price that the partnerships received upon the sale of the instruments reflecting their lack of liquidity. Petitioner maintains that the partnerships assumed similar financial risks, as well as benefits, when they sold the PPNs and CDs for cash and LIBOR notes.

There is no dispute that the partnerships owned the PPNs and CDs, that the partnerships earned interest on these instruments, or that the partnerships sold the PPNs and CDs for cash and LIBOR

notes. Further, the partnerships may have been exposed to some financial risk as a consequence of investing in the PPNs and CDs, although such risk was minimized insofar as Saba and Otrabanda had invested their funds with highly rated banks and both had the option to put or sell the PPNs and CDs back to Chase and IBJ, respectively, at their original purchase prices with accrued interest. Nevertheless, the partnerships' ownership of the PPNs, CDs, and LIBOR notes does not establish that the CINS transactions possessed "purpose, substance, or utility apart from their anticipated tax consequences". Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965); see Sheldon v. Commissioner, 94 T.C. 738, 759-760 (1990).

Petitioner maintains that the CINS transactions appreciably affected the partnerships' beneficial interests in light of the potential for the LIBOR notes to appreciate in value if interest rates were to rise. Consistent with the Supreme Court's admonition to "[fix] the character of the proceeding by what actually occurred", Gregory v. Helvering, 293 U.S. at 469, we will briefly summarize the financial results of the CINS transactions before proceeding with our analysis.

### Saba's CINS Transaction

On February 28, 1990, Saba's partners made capital contributions totaling $200 million. On the same day, Saba invested $200 million in the Chase PPNs. On March 21, 1990,

Chase made a $975,298 interest payment to Saba. Between March 21 and 23, 1990, Saba earned interest of $94,384 on the Chase PPNs. On March 23, 1990, Saba sold the Chase PPNs for $160 million in cash and 4 LIBOR notes with a present value somewhere between $37,488,889 and $38,594,384. Thus, Saba sold the Chase PPNs worth $200,094,384 ($200 million (principal) plus $94,384 (accrued interest)) for cash and LIBOR notes worth no more than $198,594,384. The $1,500,000 difference between the value of the Chase PPNs and the total consideration that Saba received represents Saba's transaction costs.

Taking into account the $975,298 interest payment that Saba received on the PPNs, Saba walked away from its $200 million investment in the Chase PPNs with no more than $199,569,682.

On July 13, 1990, Brunswick increased its interest in the 4 LIBOR notes held by Saba by purchasing 50 percent of Sodbury's partnership interest. On August 17, 1990, Saba distributed 3 of the LIBOR notes to Brunswick. On September 6, 1990, Brunswick sold the 3 LIBOR notes for $26,601,451, resulting in a loss to Brunswick of approximately $2,500,000. On April 3, 1991, Saba transferred the remaining LIBOR note to SBC. On July 2, 1991, SBC sold the LIBOR note for $7,040,954, resulting in a loss to Brunswick of approximately $719,000.

Otrabanda's CINS Transaction

On June 25, 1990, Otrabanda's partners made capital contributions totaling $150 million.  On June 29, 1990, Otrabanda invested $100 million in the IBJ CDs.  On July 18, 1990, IBJ made a $435,416 interest payment to Otrabanda.  Between July 18, 1990 and July 27, 1990, Otrabanda earned interest of $201,562 on the IBJ CDs.  On July 27, 1990, Otrabanda sold the IBJ CDs for $80 million in cash and 4 LIBOR notes with a present value somewhere between $18,909,546 and $19,451,562.  Otrabanda sold the IBJ CDs worth $100,201,562 ($100 million (principal) plus $201,562 (accrued interest)) for cash and LIBOR notes worth no more than $99,451,562.  The $750,000 difference between the value of the IBJ CDs and the total consideration that Otrabanda received represents Otrabanda's transaction costs.

Taking into account the $435,416 interest payment that Otrabanda received on the CDs, Otrabanda walked away from its $100 million investment in the IBJ CDs with no more than $99,886,978.

On October 11, 1990, Brunswick increased its interest in the LIBOR notes held by Otrabanda by purchasing 50 percent of Bartolo's partnership interest.  On November 1, 1990, Otrabanda distributed the 4 LIBOR notes to Brunswick.  On November 28, 1990, Brunswick sold the 4 LIBOR notes for $17,458,827, resulting in a loss to Brunswick of approximately $1,700,000.

As the foregoing clearly illustrates, Saba and Otrabanda lost at least $430,318 and $113,022, respectively, on their purchase and sale of the PPNs and CDs.  Moreover, Brunswick (and SBC) subsequently lost nearly $5 million on the sale of the LIBOR notes.  Even considering the payments of approximately $4,700,000 that the partnerships received on the LIBOR notes, the transactions were at best a wash.  Without more, we are unable to conclude that the CINS transactions appreciably affected the partnerships' beneficial interests.

Although the partnerships actually lost money on the CINS transactions, petitioner nevertheless contends that, at the time the CINS transactions were entered into, the partners anticipated that the LIBOR notes would appreciate in value due to an expected rise in interest rates.  We reject this contention for two reasons.  First, neither the partnerships nor Brunswick ever intended to hold the LIBOR notes more than a brief time and certainly not long enough to recoup their transaction costs. Second, we are not convinced that the profit potential of the LIBOR notes was sufficient to imbue the CINS transactions with objective economic substance.

We have already documented that the CINS transactions were scripted well in advance.  Brunswick and ABN understood, prior to the formation of the partnerships, that the partnerships would invest in PPNs and CDs for less than a month, that the PPNs and

CDs would be sold for 80 percent cash and 20 percent LIBOR notes, and that the LIBOR notes would be distributed to Brunswick and sold after a brief holding period.  Brunswick and ABN also understood that there would be significant transaction costs associated with the sale of the PPNs and CDs, as well as the LIBOR notes.  In connection with the foregoing, we dismiss Brunswick's assertion that it was unaware that it would eventually bear the transaction costs on the sale of the PPNs and CDs for cash and LIBOR notes.  Indeed, the Zelisko memorandum suggests that Brunswick knew that it would be expected to absorb these costs.

Brunswick's records indicate that it incurred net partnership expenses of at least $6 million.  Respondent contends that circumstantial evidence, including the Zelisko memorandum, ABN memoranda discussing its fees, the ABN-Brunswick consulting agreement, the Otrabanda "control" fee that Brunswick paid to Bartolo, and Brunswick's reallocation of $2,425,000 of expenses from its partnership reserve account to commissions paid to Merrill Lynch in connection with the sale of Brunswick's Technical businesses and Nireco stock, suggest that Brunswick's partnership expenses were much higher.  Respondent contends that Brunswick disguised its partnership expenses as fees paid to ABN

and broker commissions paid to Merrill Lynch.  In light of our holding in these cases, we need not address this particular contention.

Considering all the evidence, we are convinced that Brunswick was cognizant of the costs associated with the CINS transactions and accepted those costs as a "fee" for obtaining tax benefits.  Given the substantial costs associated with the transactions, there was no possibility that the transactions would generate a profit over the short period that the LIBOR notes were intended to be held.

Another aspect of the CINS transactions that bolsters our conclusion that neither the partnerships nor Brunswick intended to profit from their investment in the LIBOR notes relates to the timing of the transactions.  In particular, the partnerships were investing in new LIBOR notes, and Brunswick was increasing its interest in those notes, during a period when O'Brien's view of the direction of interest rates was changing.  From June through September 1990, O'Brien's interest rate forecast was in "transition".  By September 1990, O'Brien had abandoned the view that interest rates would rise and came to believe that interest rates would fall.  Because the value of the LIBOR notes would decline with falling interest rates, we are not convinced that either the partnerships or Brunswick reasonably expected to profit from the CINS transactions.

Nor are we convinced that the profit potential of the LIBOR notes, measured over the 5-year terms of the notes, supports the proposition that the CINS transactions were imbued with economic substance. Smith, petitioner's expert, opined that the LIBOR notes had the potential to provide returns over their 5-year terms ranging from $10,800,000 (using a market-based forecast for 3-month LIBOR) to a high of $80,683,000 (based on the "equal probability" theory of interest rate behavior). Respondent presented evidence that the LIBOR notes were not likely to generate profits for the partnerships given the "consensus" view of a broad group of market prognosticators that interest rates would decline between 1990 and 1991.

Contrary to Smith's projections, interest rates fell dramatically between February 1990 and September 1992. Specifically, 3-month LIBOR rates declined from 8.375 percent in February 1990 to 3.125 percent in September 1992. If the partnerships had held the LIBOR notes for their full 5-year terms, the partnerships would have lost $19,716,000.

Smith candidly concedes in his report that "it is impossible to predict the actual path that interest rates will follow over a given period of time." Weighing the evidence that we have on the point, we are not convinced that Smith's market-based forecast for 3-month LIBOR provides a reasonable basis for measuring the potential profitability of the LIBOR notes. Smith's forecast

produced an interest rate curve that gradually increased over the 5-year terms of the LIBOR notes. However, respondent produced evidence that a broad cross-section of economists and financial experts were forecasting falling interest rates during 1990 and 1991. Under the circumstances, we conclude that it was unreasonable to believe that there would be any substantial appreciation in the LIBOR notes over their 5-year terms. That is not to say that it would have been unreasonable to expect any profits on an investment in the LIBOR notes, only that such profits would be limited.

Relatively modest profits are insufficient, standing alone, to clothe the disputed CINS transactions with economic substance. In particular, even assuming for the sake of argument that the partnerships reasonably could have expected profits of up to $10,800,000 on a 5-year investment in the LIBOR notes, such profits would be inconsequential when compared with the capital losses of approximately $170,000,000 that the CINS transactions were designed to generate for Brunswick. See Sheldon v. Commissioner, 94 T.C. 738, 767-768 (1990); see also ACM Partnership v. Commissioner, 157 F.3d at 258; Goldstein v. Commissioner, 364 F.2d at 739-740.

In Yosha v. Commissioner, 861 F.2d 494, 499 (7th Cir. 1988), the Court of Appeals for the Seventh Circuit stated:

> A transaction has economic substance when it is the
> kind of transaction that some people enter into without

a tax motive, even though the people fighting to defend
the tax advantages of the transaction might not or
would not have undertaken it but for the prospect of
such advantages--may indeed have had no other interest
in the transaction.

In the instant cases, the partnerships converted large sums of cash into relatively illiquid investments (PPNs and CDs) and, within a few weeks, incurred significant costs converting the investment to 80 percent cash and 20 percent LIBOR notes. The partnerships' short-term investment in the PPNs and CDs, which guaranteed a net economic loss after accounting for transaction costs, begs the question why the partnerships did not simply invest 20 percent of its cash in LIBOR notes. The only plausible explanation is that the partnerships' short-term investment in the PPNs and CDs set the stage for greater financial returns in the form of tax losses for Brunswick. We are convinced that no reasonable business person would have participated in the CINS transactions, as they were designed and implemented in these cases, except for a tax motive.

In Goldstein v. Commissioner, supra, one of the taxpayers, Tillie Goldstein, sought to shelter $140,000 that she won in the Irish sweepstakes by borrowing $945,000 from 2 banks at 4 percent interest, and investing the proceeds in $1 million face amount U.S. Treasury securities maturing in 3 or 4 years, and which paid interest of either one-half of 1 percent or 1-1/2 percent. She then prepaid interest in the amount of $81,396, and sought to

deduct this amount under section 163(a).  The taxpayer offered evidence that she reasonably expected to profit from the transactions based upon assumptions related to the movement of Treasury rates.

The Court of Appeals for the Second Circuit dismissed the argument that the taxpayer reasonably expected to profit from the transactions on the grounds that the taxpayer's profit projections did not account for transaction costs of $6,500 and were based on unreasonable assumptions that the Treasury notes could be sold considerably in excess of par.  The Court of Appeals further held that "to allow a deduction for interest paid on funds borrowed for no purposive reason, other than the securing of a deduction from income, would frustrate section 163(a)'s purpose; allowing it would encourage transactions that have no economic utility and that would not be engaged in but for the system of taxes imposed by Congress."  Goldstein v. Commissioner, 364 F.2d at 742.  In short, the taxpayer's investment did not meaningfully change her economic position, and it therefore lacked economic substance.

The same may be said of Brunswick's involvement in the CINS transactions.  The intricate manipulation of the contingent installment sales rules in this case could not conceivably be the type of economically sterile transaction Congress intended to sanction.  At the end of the day, Brunswick's involvement in the

CINS transactions, with their attendant intricate investments in the PPNs, CDs, LIBOR notes, money market accounts, hedges, swaps, etc., all carefully masterminded by Merrill Lynch, did not meaningfully change Brunswick's economic position, and it therefore lacked the requisite economic substance necessary to validate Brunswick's targeted capital losses.

C. Conclusion

In sum, broad parallels may be drawn between the CINS transactions at issue herein and the purported reorganization deemed a sham in Gregory v. Helvering, 293 U.S. 465 (1935). We find that the CINS transactions served no valid business purpose, but they were designed and implemented to take the form of a CINS in a well-scripted attempt to take advantage of an unintended loophole in the contingent installment sale rules. Although the partnerships can claim ownership of substantial investments, the disputed transactions were structured to minimize the partnerships' exposure to risk and for no other purpose than to generate fictional tax losses for Brunswick.

The CINS transactions were carried out in these cases in an effort to exploit rather than to respect the principle that contingent installment sales should be reported in a manner intended reasonably to match gains and losses. As the Court of Appeals for the Third Circuit aptly concluded in ACM Partnership v. Commissioner, 157 F.3d at 252:

In order to be deductible, a loss must reflect actual economic consequences sustained in an economically substantive transaction and cannot result solely from the application of a tax accounting rule to bifurcate a loss component of a transaction from its offsetting gain component to generate an artificial loss which, as the Tax Court found is "not economically inherent in" the transaction.

Consistent with the foregoing, we conclude that the CINS transactions were economic shams that neither appreciably affected the partnerships' beneficial interests or materially altered the partnerships' economic positions. Accordingly, we sustain respondent's determination that no gains or losses will be recognized on the sales of the PPNs and CDs. In addition, we hold that Saba's bases in the LIBOR notes distributed to Brunswick and SBC were $26,601,451 and $7,032,954, respectively, while Otrabanda's basis in the LIBOR notes distributed to Brunswick was $17,458,827.

V. Secondary Issues

Petitioner argues that if the Court determines that the partnerships' purchase and sale of the PPNs and CDs do not have economic substance, then the partnerships should not be required to include in income the interest payments that they received on those instruments. Petitioner concedes that the partnerships are required to include in income the interest payments that they received on the LIBOR notes. Petitioner further contends that the partnerships are entitled to deductions for professional fees paid to N.V. Fides and Cravath, Swaine, & Moore.

Respondent contends that the partnerships are required to report interest income derived from both the PPNs and CDs as well as the LIBOR notes. Respondent further contends that petitioner failed to prove that the amounts paid to Fides and Cravath, Swaine, & Moore are legitimate partnership expenses.

Consistent with our determination that the partnerships' purchase and sale of the PPNs and CDs will not be respected for tax purposes, we agree with petitioner that the interest paid on the PPNs and CDs is not includable in the partnerships' income for the years in issue. See, e.g., Sheldon v. Commissioner, 94 T.C. 738, 762 (1990). Consistent with this holding, the partnerships are not entitled to any deductions associated with the purchase and sale of the PPNs and CDs.

The parties are in agreement that the partnerships are required to include in their taxable income the interest payments that they received on the LIBOR notes during the taxable years in issue. Consistent with the parties' agreement on this point, we conclude that the partnerships are entitled to deduct a portion of the fees that Saba and Otrabanda paid to the Cravath firm.

Respondent disallowed a deduction of $120,266 that Saba had reported for amounts paid to the Cravath firm during the taxable year ended March 31, 1991, as well as the amortization of $1,500 and $8,500 attributable to amounts paid to the Cravath firm for the taxable years ended March 31, 1991 and June 21, 1992,

respectively.  Respondent also disallowed a deduction of $72,996 that Otrabanda had reported for amounts paid to the Cravath firm during the taxable year ended June 21, 1991.  However, the record in these cases includes a memorandum from Cravath to Brunswick dated December 2, 1994, in which Cravath itemized its $125,000 charge to Saba for professional services as follows:

> The $125,000.00 fee was for negotiation and drafting of the documentation, and for other related services, in connection with: (a) the formation of Saba ($19,452.45), (b) the purchase by Saba of certain notes ($25,576.37), (c) the sale by Saba of such notes ($46,649.86), (d) the assignment of Saba's right to receive payments from such sale ($11,887.60) and (e) other related matters ($21,433.72). * * *

In the same memorandum, Cravath itemized its $68,000 charge to Otrabanda for professional services as follows:

> The $68,000.00 fee was for negotiation and drafting of the documentation, and for other related services, in connection with: (a) the formation of Otrabanda ($12,215.57), (b) the purchase by Otrabanda of certain certificates of deposit ($12,537.03), (c) the sale by Otrabanda of such certificates ($23,193.51), (d) the assignment of Otrabanda's right to receive payments from such sale ($6,209.58) and (e) other related matters ($13,844.31). * * *

We hold that Saba and Otrabanda are entitled to deductions for fees paid to the Cravath firm other than fees associated with the purchase and sale of the PPNs and CDs.  Based upon the record presented, we hold that Saba and Otrabanda are entitled to deduct $19,452.45 and $12,215.57, respectively, representing the fees paid to Cravath in connection with the formation of the partnerships, subject to the limitations on the deduction of

organization expenses set forth in section 709(b).  Petitioner has failed to show that any of the remaining fees paid to the Cravath firm are unrelated to the purchase and sale of the PPNs and CDs.

Finally, we sustain respondent's disallowance of the $25,000 deductions that both Saba and Otrabanda claimed for "incorporation fees" paid to N.V. Fides.  Petitioner simply has failed to substantiate these particular deductions to the Court's satisfaction.

To reflect the foregoing,

Decisions will be

entered under Rule 155.